**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** 1101 K Street, N.W., Suite 201 Washington, DC 20005, <br><br> **NOAH BOOKBINDER** 10206 Brookmoor Dr. Silver Spring, MD 20901, <br><br>  Plaintiffs, <br><br> v. <br><br> **FEDERAL ELECTION COMMISSION** 1050 First St., N.E. Washington, DC 20463, <br><br>  Defendant. | Civil Action No. 19-2753 |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.  This is an action for injunctive and declaratory relief under the Federal Election Campaign Act of 1971 ("FECA" or "the Act"), 52 U.S.C. § 30109(a)(8)(A), challenging the Federal Election Commission's ("FEC" or "Commission") failure to act on an administrative complaint by Citizens for Responsibility and Ethics in Washington ("CREW") and Noah Bookbinder (collectively "Plaintiffs") against SEALs for Truth, Nicholas Britt, individually and in his capacity as Treasurer for SEALs for Truth, American Policy Coalition, Inc., LG PAC, Richard Monsees, individually and in his capacity as Treasurer for LG PAC, Freedom Frontier, and Unknown Respondents (collectively "Respondents"). The complaint alleged that Respondents concocted and executed a conduit contribution scheme that used nonprofits to funnel money to federal super PACs in order to conceal the identity of donors supporting the election of now-former Missouri Governor Eric Greitens in 2016, in violation of the FECA. Plaintiffs filed the administrative complaint on June 29, 2018, filed an amended administrative

complaint on August 8, 2018, and filed a second amended administrative complaint on November 20, 2018 to highlight new information that had come to light since the filing of the original administrative complaint. Now, more than 14 months after CREW filed its original administrative complaint, the FEC has failed to act.

## JURISDICTION AND VENUE

2.  This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 706. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202. Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

3.  Plaintiff CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code.

4.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics. CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency. Further, CREW seeks to ensure that campaign finance laws are properly interpreted, enforced, and implemented.

5.  To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions. A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity

of public officials, candidates for public office, the electoral process, and our system of government.

6. Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election. CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors. Using the information in those reports, CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

7. CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

8. CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden. Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only source of information about those individuals and groups funding the political process. As a result of the FEC's refusal to enforce the FECA, organizations and individuals are able to launder their contributions through third parties. This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

9. As an example, in May 2016, CREW issued a report, *Welcome to Washington: New Members of Congress Attract Special Interest Money,* that analyzed fundraising by newly elected members of Congress in their first year in office. CREW's analysis was based on FEC campaign contribution records that identified contributions to those members from special interest PACs, including PACs tied to corporations, unions, and issues groups. From this data, CREW determined that new members of the House of Representatives embraced fundraising from special interests after they took office and became more reliant on that money than they had been as candidates. Those members raised nearly $17.3 million from special interest PACs in 2015, an increase of 15.8% over the amount they raised as candidates during the entire 2014 election cycle. CREW further found that special interest PAC money accounted for an average of 37.6% of total funds raised by the new members in 2015, more than double the 17.3% average rate from the 2014 election cycle. CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions – federal candidates, party committees, PACs, and super PACs – are subject under the FECA.

10. As another example, on August 21, 2017, CREW published a blog post entitled *Synchronized Spending: The Dark Money Phantom's New Illusion*, which highlighted section 501(c)(4) dark money nonprofits that fully fund multiple federal super PACs that attack or support the same candidates. By making the work of one group appear to be the work of two independent groups, this tactic misleads the public, exaggerates candidates' outside support, and exacerbates the problems caused by secret money in politics. CREW obtained the information used in this post from information the FECA requires political committees to disclose.

11. Plaintiff Noah Bookbinder is the executive director of CREW. He is a citizen of the United States and a registered voter and resident of the state of Maryland. As a registered

voter, Mr. Bookbinder is entitled to receive all the information the FECA requires those engaged in political activities to report publicly. He is further entitled to the FEC's proper administration of the provisions of the FECA. Mr. Bookbinder is harmed in exercising his right to an informed vote when a political committee fails to report the true source of its contributions, as the FECA requires.

12. When Plaintiffs file complaints against violators of the FECA, they rely on the FEC, as the preliminary civil enforcement authority, to comply strictly with the FECA when making its investigative and enforcement decisions. *See* 52 U.S.C. § 30107(e). Plaintiffs are harmed and are "aggrieved" parties when the FEC refuses to act on meritorious complaints, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA. *See* 52 U.S.C. § 30109(a)(8)(C).

13. Defendant FEC is the federal agency established by Congress to oversee the administration and civil enforcement of the FECA. *See* 52 U.S.C. §§ 30106, 30106(b)(l).

## STATUTORY AND REGULATORY BACKGROUND

14. The FECA and the implementing FEC regulations require the disclosure of the true source of contributions. This is one of a number of disclosure requirements designed to ensure that the public and voters are fully apprised of election-related spending.

15. Under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its

independent expenditures and electioneering communications. 52 U.S.C. § 30104(a)(4), (b), (f)(2); 11 C.F.R. §§ 104.3, 104.4, 104.20(b), *see also* 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a) (definition of a "political committee"). Because federal political committees are, by definition, federal campaign related, all funds donated to them are reportable contributions under federal law.

16.     In addition, the FECA requires all persons, including political committees, to report to the FEC "independent expenditure[s]" they make. 52 U.S.C. § 30104(b)(4)(H)(iii), (c). An independent expenditure is an expenditure by a person that "expressly advocat[es] the election or defeat of a clearly identified candidate" that is made independently of such candidate or party. 52 U.S.C. § 30101(17); *see also* 52 U.S.C. § 30101(9)(A) (definition of "expenditure"). Persons who are not political committees who make over $250 in independent expenditures in a calendar year must file a statement with the FEC disclosing, among other things, the identity of any contributor who contributes more than $200 a year to the independent expenditure maker, and the identity of any contributor who gave more than $200 to further an independent expenditure. 52 U.S.C. § 30104(c)(1), (c)(2)(C).

17.     In requiring political committees and independent expenditure makers to disclose the identity of contributors, the FECA requires the disclosure of the true source of contributions. The "true source" of a contribution is the person who "arrange[s]" for the contribution, not just the person who conveys the funds to the recipient. *United States v. Hsia*, 176 F.3d 517, 523–24 (D.C. Cir. 1999). To ensure the public learns the true source of a contribution and to prevent the reporting of a mere pass-through entity as that source, the FECA and FEC regulations prohibit making a contribution in the name of another person, knowingly permitting one's name to be used for the purpose of making a contribution in the name of another person, and knowingly

accepting a contribution made by one person in the name of another person. Specifically, 52 U.S.C. § 30122 provides: "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

18. FEC implementing regulations echo these prohibitions on making a contribution in the name of another, knowingly permitting one's name to be used to effect a contribution, knowingly helping or assisting another to do so, and knowingly accepting a contribution made by one person in the name of another person. 11 C.F.R. § 110.4(b). The regulation includes, as an example of a prohibited contribution, giving money, "all or part of which was provided to the contributor by another person (the true contributor) without disclosing the source of money[.]" *Id.* at § 110.4(b)(2).

19. Under the FECA, any person who believes there has been a violation of the Act may file a sworn complaint with the FEC. 52 U.S.C. § 30109(a)(l). Based on the complaint, the response from the person or entity alleged to have violated the Act, facts developed by the Office of General Counsel ("OGC"), and any OGC recommendation, the FEC decides whether there is "reason to believe" a violation of the FECA has occurred. 52 U.S.C. § 30109(a)(2).

20. A "reason to believe" exists where a complaint "credibly alleges" a violation of the FECA "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545 (Mar. 16, 2007). If four commissioners find there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and "shall make an investigation of such alleged violation." 52 U.S.C. § 30109(a)(2).

21.     The FECA further provides that the complainant may sue the FEC 120 days after filing the complaint if the FEC "fail[s] to act" on the complaint. 52 U.S.C. § 30109(a)(8)(C). The FEC has a legal duty to take final action on a complaint expeditiously. 52 U.S.C. § 30107(a)(9). A court that finds the FEC has failed to act expeditiously may declare the failure contrary to law and order the FEC to conform with that declaration within thirty days. *Id.* If the FEC continues to fail to act and does not conform with the declaration within thirty days, "the complainant may bring, in the name of such complainant, a civil action [against the respondent(s)] to remedy the violation involved in the original complaint." *Id.*

## FACTUAL BACKGROUND

22.     On June 29, 2018, CREW and its executive director Noah Bookbinder filed an administrative complaint with the FEC against SEALs for Truth, Nicholas Britt, individually and in his capacity as Treasurer for SEALs for Truth, American Policy Coalition, Inc., LG PAC, Richard Monsees, individually and in his capacity as Treasurer for LG PAC, Freedom Frontier, and Unknown Respondents (collectively "Respondents"). The matter was given MUR number 7422. A copy of the administrative complaint is attached as Exhibit 1. On August 8, 2018, CREW and Noah Bookbinder filed an amended administrative complaint, and on November 20, 2018, CREW and Noah Bookbinder filed a second amended administrative complaint. Both amended complaints were filed to include new facts that had come to light since the filing of the previous complaint. A copy of the first and second amended administrative complaints are attached as Exhibit 2 and Exhibit 3, respectively.

23.     The complaint and amended complaints detail a plan, unearthed by the Missouri House of Representatives Special Investigative Committee on Oversight ("Oversight Committee") during an investigation of scandals related to Mr. Greitens, to use FEC-registered

political committees to conceal donor identities. Through campaign documents and the sworn testimony of a former campaign consultant, the Oversight Committee discovered that the Greitens campaign and its supporters devised a scheme to conceal donors by allowing donors who did not want their identities to be disclosed, as is required by campaign finance law, to donate to outside groups that would then funnel the money to the Greitens campaign or spend funds in support of the campaign.

24. The scheme involved using section 501(c)(4) social welfare organizations as vehicles for concealing donors, because, unlike political committees or campaigns, section 501(c)(4) organizations are not required to disclose their donors.

25. The Oversight Committee's investigation further revealed evidence that the Greitens campaign was interested in courting donors unable to lawfully donate to political committees. This included individuals restricted from donating, due to pay-to-play regulations, as well as foreign donors.

26. FEC and IRS filings confirm that supporters of Mr. Greitens' campaign appear to have executed the planned conduit contribution scheme in mid-2016. This occurred through two pairs of organizations: American Policy Coalition/SEALs for Truth and Freedom Frontier/LG PAC.

*American Policy Coalition/SEALs for Truth*

27. SEALs for Truth is a federal independent-expenditure only committee ("super PAC") formed under the FECA in June 2016, and Nicholas Britt is its treasurer.

28. American Policy Coalition, Inc. is a tax-exempt organization, organized under section 501(c)(4) of the Internal Revenue Code and established in Kentucky. American Policy Coalition does not and is not required to disclose its contributors.

29.     On July 18, 2016, American Policy Coalition transferred $2 million to SEALs for Truth. That same day, SEALs for Truth contributed $1.975 million to Mr. Greitens' campaign committee, Greitens for Missouri.

30.     The money, which a contemporary news report described as "by far, the single largest political contribution in Missouri history to an individual candidate," appears to have been put to immediate use by the Greitens campaign. On the day of the contribution, the campaign made two payments totaling a little more than $2 million for "media" to Target Enterprises, a media buying firm affiliated with Mr. Greitens' general consultant, Nick Ayers.

31.     Since SEALs for Truth is a federal super PAC and files its disclosure reports with the FEC rather than the Missouri Ethics Commission, the source of SEALs for Truth's money was not revealed until after the August 2, 2016 Missouri gubernatorial primary. Indeed, American Policy Coalition's $2 million transfer to SEALs for Truth was not revealed until October 14, 2016, when it filed its 2016 October Quarterly report with the FEC. American Policy Coalition was SEALs for Truth's only reported contributor during the relevant time period and was responsible for all the money that was ultimately contributed by SEALs for Truth to Greitens for Missouri.

32.     As the evidence of the scheme indicates, America Policy Coalition is not the true source of the contributions to SEALs for Truth. Rather, certain Unknown Respondents arranged for contributions to pass through America Policy Coalition to SEALs for Truth. Accordingly, the true sources of the contributions to SEALS for Truth remain unknown.

*Freedom Frontier/LG PAC*

33.     LG PAC is a federal independent-expenditure only committee formed under the FECA in May 2016, and Richard "Hank" Monsees is its treasurer.

34. Freedom Frontier is a tax-exempt organization, organized under section 501(c)(4) of the Internal Revenue Code. It was established in Texas in 2011. Freedom Frontier does not and is not required to disclose its contributors.

35. Between June 1, 2016 and July 29, 2016, LG PAC reported contributions totaling $4.37 million from Freedom Frontier, the only contributor LG PAC has ever reported receiving money from. During that same time, the super PAC reported spending $4.361 million on "media," labeling some of the expenditures as for a "state race."

36. The super PAC did not specify which candidates it was supporting or opposing. If LG PAC had been registered with the Missouri Ethics Commission rather than the FEC, it would have been required to file reports detailing direct expenditures made to support or oppose a candidate. Even though LG PAC was spending in a state race, because it registered as a federal super PAC the organization shielded itself from the level of disclosure required of Missouri state continuing committees.

37. According to an analysis of TV ad spending by a news organization, LG PAC spent at least $3.9 million on ads in the Missouri gubernatorial race, and many, if not all, of these ads attacked Mr. Greitens' opponents.

38. As the evidence of the scheme indicates, Freedom Frontier is not the true source of the contributions to LG PAC. Rather, certain Unknown Respondents arranged for contributions to pass through Freedom Frontier to LG PAC. Accordingly, the true sources of the contributions to LG PAC remain unknown.

*Deep Ties Between the Greitens Campaign,
the Nonprofit Organizations, and the Super PACs*

39. There are significant ties between Mr. Greitens' campaign, the nonprofit organizations, and the super PACs that together conceived and executed the conduit contribution

scheme.

40. Mr. Ayers, one of Mr. Greitens' top campaign consultants, was directly involved with both the Greitens campaign and Freedom Frontier, the nonprofit that funded LG PAC.

41. The treasurer of LG PAC, Richard Monsees, also had ties to the Greitens campaign and was photographed making phone calls on behalf of the campaign at a Greitens campaign event.

42. The treasurer of SEALs for Truth, Nicholas Britt, also had personal connections to Mr. Greitens, as, according to Mr. Greitens, they attended Navy SEAL training together.

43. American Policy Coalition and Freedom Frontier, the two section 501(c)(4) entities involved in the conduit contribution scheme, have close ties to each other. They have each identified themselves as "related tax-exempt organizations" to the IRS, they shared several officers and directors, and American Policy Coalition reported contributing $381,000 to Freedom Frontier.

*CREW's FEC Complaint and the FEC's Pattern of Delay*

44. CREW's FEC complaint and amended complaints detailed the scheme described in paragraphs 23 to 43, above, in greater detail and with reference to supporting documentation.

45. On July 6, 2018, the FEC sent Plaintiffs an acknowledgement letter confirming receipt of the administrative complaint, and it confirmed receipt of the first and second amended administrative complaints on August 15, 2018 and November 29, 2018, respectively.

46. As of the date of this filing, the FEC has not reached or made public a final decision on MUR 7422, over 14 months after the filing of the administrative complaint and 9 months after the filing of the second amended administrative complaint.

47.     Certain FEC remedies for violations of the FECA are subject to a five-year statute of limitations under 28 U.S.C. § 2462. Assuming there is no basis for tolling, the statute of limitations would begin to limit the remedies available on Plaintiffs' allegations starting on June 1, 2021.

48.     Significant delays in acting on a pending complaint are not uncommon at the FEC, leading one FEC commissioner to express concern that "[e]ffective enforcement of the law is undermined by pervasive delays." *In the Matter of American Conservative Union, et al.*, Statement of Reasons of Comm'r Ellen L. Weintraub, MUR 6920 (Dec. 19, 2017), *available at* http://bit.ly/2CDnumJ.

49.     The pervasive delays also often serve as a cause for other FEC commissioners to halt enforcement actions. For example, on May 23, 2011, CREW filed a complaint with the FEC alleging that the Commission on Hope, Growth and Opportunity ("CHGO") violated the FECA by spending more than $2.3 million to broadcast television ads in 12 elections for seats in the House of Representatives. Despite the nature and extent of the spending, CHGO failed to file disclosures as required by the FECA and failed to register as a political committee, which CREW alleged constituted violations of the FECA. *In the Matter of The Commission on Hope Growth and Opportunity*, Complaint, MUR 6471 (May 23, 2011), *available at* http://bit.ly/2qHA6aL; Amended Complaint, MUR 6471 (Apr. 26, 2012), *available at* https://bit.ly/2wBbjFD. The complaint languished before the FEC, with months and even years passing between actions. *See* Summary, MUR 6471 *available at* http://bit.ly/2o52aBt. Finally, in November 2015, more than four years after CREW filed its complaint, three controlling commissioners voted to exercise their discretion to dismiss the case and close the file without finding reason to believe that there was a violation of the FECA, in part because the "statute of limitations [had] effectively

expired." *Id.*, Statement of Reasons of Vice Chairman Matthew S. Petersen, and Comm'rs Caroline C. Hunter and Lee E. Goodman, MURs 6391 and 6471 (Nov. 6, 2015), *available at* http://bit.ly/2D8LW0m.

50. Similarly, on February 27, 2015, CREW filed a complaint against American Conservative Union, Now or Never PAC, James C. Thomas III, and Unknown Respondent alleging legal violations stemming from a failure to disclose the true source of a $1.71 million contribution to Now or Never PAC. *In the Matter of American Conservative Union, et al.*, Complaint, MUR 6920 (Feb. 27, 2015), *available at* http://bit.ly/2D6UHI7. OGC investigated the allegations and recommended finding reason to believe the respondents violated the FECA. *Id.*, First General Counsel's Report (Jan. 20, 2016), *available at* http://bit.ly/2swd1sQ. That report, however, sat before the commissioners for a full year, and by the time the FEC was willing to move forward on the matter it was "just about out of time" with regard to the statute of limitations. *Id.*, Statement of Reasons of Comm'r Ellen L. Weintraub (Dec. 19, 2017), *available at* http://bit.ly/2CDnumJ.

51. While the FEC eventually found reason to believe that certain respondents violated the FECA, resulting in a $350,000 fine, the controlling commissioners ultimately declined to pursue investigation and enforcement against other unknown respondents who were either the true source of the contribution or also acted as a conduit, justifying this decision in large part due to the impending statute of limitations. *Id.*, Statement of Reasons of Vice Chair Caroline C. Hunter and Comm'r Lee E. Goodman (Dec. 20, 2017), *available at* http://bit.ly/2CTqQ8q. The decision not to pursue further investigation constituted "an egregious example of someone using a web of organizations to hide the true source of a $1.7 million

contribution to a super PAC — and getting away with it." *Id.*, Statement of Reasons of Comm'r Ellen L. Weintraub (Dec. 19, 2017).

52.    CREW is not alone in having resolution of its complaints unlawfully delayed. For example, one complaint filed *in 2012* still had not been resolved, despite a recommendation from the FEC's Office of General Counsel that has been pending for over *1,665* days, as of May 1, 2019. FEC, Response to Questions from the Committee on House Administration, 17 (May 1, 2019) [hereinafter "FEC, Responses to Questions"], *available at* https://bit.ly/2HjbrQ6. The Commission had held over consideration of that matter ten times and apparently had not even scheduled it for consideration between September 12, 2017 and May 1, 2019. *Id.*

53.    Lack of enforcement due to extreme delay is widespread at the FEC. In a May 1, 2019 written statement to Congress, the FEC reported that, of the 289 cases on the enforcement docket as of that date, 45 of those cases "have at least some activity that is beyond the statute of limitations or will be before May 1, 2020." FEC, Responses to Questions, at 14.

54.    The FEC Chair testified to Congress that a sufficient number of commissioners capable of blocking agency action are intentionally delaying action on complaints in order to avoid enforcement of the FECA. *See* Chair Ellen L. Weintraub's Supplemental Responses to Questions From the Committee on House Administration (May 1, 2019), *available at* https://bit.ly/2Wv4Pqi. By running out the clock and then citing the age of the complaint as a basis to exercise prosecutorial discretion to dismiss, these commissioners immunize their actions from judicial review under current case law—to the frustration of Congress's intent—while aiding and abetting violations of the law.

55.    On information and belief, that same bloc of commissioners—enough to block agency action—are delaying agency action on CREW's administrative complaint in MUR 7422

for the purpose of aiding and abetting the Respondents' violations of the law and evading judicial review of their illegal actions.

56. Even when not used for illegal purposes, such delays commonly impact the FEC's ability to carry out its enforcement function, as documents may be destroyed or lost and witness memories may fade. Also, the organization at issue may shut down or cease operations making it more difficult to access documents and witnesses. In addition, the running of the five-year statute of limitations constrains the FEC's enforcement, as after the statute has run, it can no longer issue fines.

57. These delays also hamper Plaintiffs' ability to access the information that it is entitled to under the statute. Furthermore, to the extent evidence is lost or degraded during a multi-year delay at the FEC, the delay undermines Plaintiffs' ability to litigate under the FECA should Plaintiffs file a suit alleging that an FEC final action is contrary to law, or if Plaintiffs bring a civil action in their own names as permitted by the FECA.

58. Moreover, recent developments show that the FEC cannot now act on CREW's complaint. On August 26, 2019, Commissioner Matthew S. Petersen announced his resignation from the FEC Commission, effective August 31, 2019. Commissioner Petersen's resignation deprives the Commission of its legally required four-member quorum to approve the investigation of complaints such as CREW's here. 52 U.S.C. § 30106(c). The FEC's failure to act on CREW's complaint before now has now rendered any future action on CREW's complaint a legal impossibility, until at least one new commissioner assumes office.

## **CAUSE OF ACTION**

(FEC Inaction Contrary to Law)

59. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

60. The FEC received Plaintiffs' administrative complaint against SEALs for Truth, Mr. Britt, American Policy Coalition, LG PAC, Mr. Monsees, Freedom Frontier, and Unknown Respondents on July 2, 2018, more than one year ago, and it received Plaintiffs' second amended complaint on November 21, 2018, more than 8 months ago.

61. Plaintiffs' administrative complaint credibly alleged violations of FECA and FEC regulations by Respondents. In addition, the FEC has all the information required to take final agency action with respect to Plaintiffs' complaint, and no additional agency resources are required.

62. The FEC has failed to act in a timely manner on the administrative complaint. To date, the FEC has not reached a resolution of the matter or disclosed taking any action on the administrative complaint. Commissioner Petersen's resignation further renders any future action impossible, until at least one additional commissioner assumes office.

63. Sufficient time has elapsed to allow the FEC to conduct an investigation of MUR 7422. The FEC's failure to act on the administrative complaint is unreasonable and contrary to law under 52 U.S.C. § 30109(a)(8), and the Court may compel the FEC to act.

64. Any party aggrieved by the failure of the FEC to act on an administrative complaint may petition the Court for a declaration that the failure is unlawful and for an order that the FEC conform with this declaration within 30 days. 52 U.S.C. § 30109(a)(8).

65. Action by the FEC on MUR 7422 may result in the FEC compelling Respondents to disclose the source of the contributions to Freedom Frontier and/or American Policy Coalition. If the FEC determines that any of the Respondents acted knowingly and willfully, it may make a referral to the Department of Justice for investigation into possible criminal penalties.

66. Plaintiffs have been harmed by the FEC's failure to act on the administrative complaint. The FEC's failure to act has allowed Respondents to continue to keep confidential information that, under the FECA, they were required to disclose. This failure to disclose information to which Plaintiffs are entitled hinders CREW in its programmatic activity and hinders Mr. Bookbinder in his ability to review campaign finance information.

67. Thorough investigation of administrative complaints and timely action by the FEC in making a final determination is in the public interest, and the FEC should rule on Plaintiffs' administrative complaint without further delay.

68. Further, if the FEC proves unwilling or incapable of further action on CREW's complaint, CREW has the right to bring a civil action in its own name to remedy the violations alleged in that complaint, as permitted by the FECA after the Court declares that FEC's failure to act is contrary to law.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Declare that the FEC's failure to act on Plaintiffs' Complaint (MUR 7422) is contrary to law;

(2)     Order the FEC to act on the Complaint within 30 days, pursuant to 52 U.S.C. § 30109(a)(8)(C); and

(3)     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Laura C. Beckerman*
Laura C. Beckerman
(D.C. Bar No. 1008120)
Stuart McPhail
(D.C. Bar No. 1032529)
Adam J. Rappaport
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
   in Washington
1101 K Street, N.W., Suite 201
Washington, DC 20005
Phone: (202) 408-5565
Fax: (202) 588-5020
lbeckerman@citizensforethics.org