IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY<br>AND ETHICS IN WASHINGTON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>FEDERAL ELECTION COMMISSION<br><br>    Defendant. | Civil Action No. 19-2753 |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST
DEFENDANT FEDERAL ELECTION COMMISSION**

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Noah Bookbinder, pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, respectfully move for the entry of default judgment against defendant Federal Election Commission ("FEC" or "Commission"). Plaintiffs brought this action against the FEC for failure to act on a pending administrative complaint that alleges violations of the Federal Election Campaign Act ("FECA"). The FEC failed to appear, answer, plead, or otherwise defend this action as required by the Federal Rules of Civil Procedure, and the Clerk of the Court entered a default against the FEC on February 3, 2020. Doc. 7. As required by Rule 55(d) of the Federal Rules of Civil Procedure, Plaintiffs put forth this submission containing evidence sufficient to establish that the FEC has failed to act, which is contrary to law, and establishes their right to relief against the FEC. Accordingly, Plaintiffs request that the Court enter judgment against the FEC and in favor of Plaintiffs declaring that the FEC's failure to act is contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) and direct the Commission to conform with such declaration within 30 days. Plaintiffs further request that the Court assess $400 in court costs, pursuant to 28 U.S.C. § 1920.

In support of this motion, Plaintiffs submit the attached Declaration of Attorney Laura C. Beckerman (Beckerman Decl.) and Exhibits 1-10.

## I.     Statement of Facts

*Plaintiffs' Administrative Complaints*

1. On June 29, 2018, Plaintiffs filed an administrative complaint with the FEC against SEALs for Truth, Nicholas Britt, individually and in his capacity as Treasurer for SEALs for Truth, American Policy Coalition, Inc., LG PAC, Richard Monsees, individually and in his capacity as Treasurer for LG PAC, Freedom Frontier, and Unknown Respondents (collectively "Respondents"), which is attached as Exhibit 1.[1]

2. The complaint and amended complaints detail a plan, unearthed by the Missouri House of Representatives Special Investigative Committee on Oversight ("Oversight Committee") during an investigation of scandals related to Eric Greitens, former governor of Missouri who was running for governor at the time, to use FEC-registered political committees to conceal donor identities. Through campaign documents and the sworn testimony of a former campaign consultant, the Oversight Committee discovered that the Greitens campaign and its supporters devised a scheme to conceal donors by allowing donors who did not want their identities to be disclosed, as is required by campaign finance law, to donate to outside groups that would then funnel the money to the Greitens campaign or spend funds in support of the campaign. *See* Doc. 1, Complaint at ¶¶ 23-43.

---

[1] Plaintiffs amended their administrative complaint on August 8, 2018 and again on November 20, 2018. Both amended complaints were filed to include new facts that had come to light since the filing of the previous complaint. The amended complaints are attached as Exhibits 2 and 3, respectively.

3. Specifically, Plaintiffs alleged that the Greitens campaign engaged in a scheme to conceal the identities of donors to the campaign by routing more than $6 million in donations through two nonprofits, American Policy Coalition and Freedom Frontier, to two federal super PACs, SEALs for Truth and LG PAC. SEALs for Truth then directly contributed $1.975 million to the Greitens Campaign, while LG PAC spent more than $4.3 million on advertisements and other media supporting Mr. Greitens and attacking is opponents. Plaintiffs alleged that all of these groups were closely connected to the Greitens campaign and to each other and shared consultants and officers. The effect of this conduit contribution scheme was to illegally conceal the identity of significant Greitens campaign donors from the public. *See* Exhibit 1, ¶ 2.

4. Plaintiffs' administrative complaint and amended complaints described the Greitens campaign scheme in great detail and with reference to supporting documentation. *See* Doc. 1, at ¶ 44; Exhibits 1-3.

5. On July 6, 2018, the FEC acknowledged receipt of Plaintiffs' administrative complaint and assigned the matter MUR No. 7422. *See* Exhibit 4.

6. Besides acknowledging receipt of the administrative complaints, CREW has received no further communication from the FEC regarding MUR No. 7422. Beckerman Affidavit at ¶ 10.

7. Plaintiffs awaited a determination of their administrative complaint, to no avail, for over 14 months before filing the above-captioned suit on September 16, 2019. Doc. 1.

8. In this suit, Plaintiffs seek declaratory relief that the FEC's failure to act on Plaintiffs' administrative complaint (MUR No. 7422) is contrary to law; Plaintiffs further seek

3

injunctive relief that the FEC be ordered to act on the administrative complaint within 30 days, pursuant to 52 U.S.C. § 30109(a)(8)(C). Doc. 1.

*FEC's Inaction, Gridlock, and Loss of a Quorum*

9. To date, the FEC has not taken any public action with respect to MUR No. 7422. *See* FEC, Enforcement Query System, *available at* https://eqs.fec.gov/eqs/searcheqs (search for "MUR 7422" yields the response "No Matches Found").[2]

10. On September 1, 2019, the FEC lost a quorum of four commissioners following the resignation of Commissioner Matthew Petersen. Exhibit 5, Press Release, FEC remains open for business despite lack of quorum, Sept. 11, 2019; *see* Exhibit 6, FEC, Commission Directive No. 10, Rules of Procedure of the Federal Election Commission Pursuant to 2 U.S.C. 437c(e) (June 8, 1978), Am. Dec. 20, 2007.

11. The loss of a quorum deprived the FEC of the ability to "launch any new investigations, issue any advisory opinions, promulgate any rules, or render any decisions on pending enforcement actions." *See* Exhibit 7, Ellen L. Weintraub, *The State of the Federal Election Commission* (Nov. 1, 2019).

12. Even prior to the loss of a quorum, however, commissioners sufficient to prevent a majority vote ("controlling commissioners") at the FEC failed to take meaningful steps to review and investigate the complaints submitted to it. Rather, "the Commission frequently closed matters without so much as making a phone call to investigate potential wrongdoing." Exhibit 8, Ellen L. Weintraub, *The State of the Federal Election Comm'n: 2019 End of Year* Report, at 2 (Dec. 20, 2019).

---

[2] The Query system contains "completed enforcement cases and their public documents." FEC, Enforcement Query System, *available at* https://eqs.fec.gov/eqs/searcheqs

13. With regard to enforcement matters, many "languished for months or years at the request of [Commissioner Weintraub's] Republican colleagues, causing some to near the end of their statutory limitations, only for these Commissioners to then decline to investigate at all," and this included "some of the most alarming allegations of campaign-finance violations [the FEC] considered in 2019." Exhibit 8 at 2.

14. Unfortunately, this pattern of deadlock and inaction at the FEC is nothing new. In 2017, then-Commissioner Ann M. Ravel issued a report establishing, based on ten years of analysis, that the FEC "is not performing the job that Congress intended, and violators of the law are given a free pass." Exhibit 9, Office of Comm'r Ann M. Ravel, *Dysfunction and Deadlock: The Enforcement Crisis at the Federal Election Comm'n Reveals the Unlikelihood of Draining the Swamp* (Feb. 2017).

15. This report detailed a concerning pattern of delay and inaction regarding enforcement matters:

    a. In enforcement matters, the number of deadlocked substantive votes had increased more than ten-fold from just 2.9% of substantive votes in enforcement cases closed in 2006 to over 37% in enforcement matters closed in 2016. Exhibit 9 at 1.

    b. From 2006 to 2016, the FEC dramatically reduced the fines levied in enforcement matters from more than $5.5 million in 2006 to less than $600,000 in 2016. Exhibit 9 at 2.

    c. Also during this time period, the controlling bloc of commissioners "unilaterally imposed higher requirements to find [reason to believe that a violation may have

occurred]." The effect of this change is to "stymie[] the Commission's ability to even *open* an investigation and uphold the law in major cases." Exhibit 9 at 7.

16. At this time, the FEC remains in default with respect to this lawsuit and has not appeared, answer, or otherwise defended the action. *See* Docket activity.

17. Plaintiffs have incurred $400 in court costs, as defined under 28 U.S.C. § 1920, in seeking this default judgment. *See* Ex. 10, Docket Activity as of March 6, 2020 (Doc. 1 shows receipt number for filing fee paid).

**II.     Argument**

    **A.  Default Judgment**

Rule 55(b) of the Federal Rules of Civil Procedure permits default judgment to be entered if the party against whom judgment is sought has failed to plead or otherwise defend in the action. While the law generally favors decisions on the merits, when unresponsive parties threaten to halt the progress of litigation, judgment by default is available to protect the responsive party "lest he be faced with interminable delay and continued uncertainty as to his rights." *Gilmore v. Palestinian Interim Self-Gov't Authority*, 843 F.3d 958, 965 (D.C. Cir. 2016) (*citing H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)).

Where the party in default is the United States, default judgment may be entered "only if the claimant establishes a claim or right to relief by evidence that satisfies the court." Fed. R. Civ. P. 55(d). This rule, however, "'does not relieve the government from the duty to defend cases or obey the court's orders. Indeed this privilege against default judgment . . . heightens the government's duty to defend cases . . . ." *Payne v. Barnhart*, 725 F. Supp. 2d 113, 119 (D.D.C. 2010) (*quoting Alameda v. Sec'y of Health, Ed. And Welfare*, 622 F.2d 1044, 1048 (1st Cir.

1980)). Nor is this evidentiary burden an especially high one. After entry of default against the government, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Alameda*, 622 F.2d at 1048 (discussing Rule 55(e), which is now Rule 55(d)).

### B. FEC's Failure to Act Is Contrary To Law

Under the FECA, this Court may "declare that the . . . [FEC's] failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days . . . ." 52 U.S.C. § 30109(a)(8)(C). When the issue before a court is "failure to act," "[c]ourts must determine whether the Commission has acted 'expeditiously.'" *Common Cause v. FEC*, 489 F. Supp. 738, 744 (D.D.C. 1980). This analysis involves examination of "[1] the credibility of the allegation, [2] the nature of the threat posed, [3] the resources available to the agency and the information available to it, [4] as well as the novelty of the issues involved." *Common Cause*, 489 F. Supp. at 744. Courts also consider the factors outlined *in Telecommunications Research & Action Center v. FCC*, 750 F. 2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"), which include the [1] "rule of reason" regarding the time elapsed as informed by the [2] statutory timetable, [3] the reasonableness of delay given the stakes, [4] the effect expedition would have on agency priorities, and [6] the interests prejudiced by delay. 750 F.2d at 80. While the *TRAC* Court stated that it "need not find" agency impropriety, should impropriety exist, that would constitute a factor in favor of finding that the delay was contrary to law. *Id*.

Although the Commission's decision whether to investigate "is entitled to considerable deference, the failure to act in making such a determination is not." *DSCC v. FEC*, No. CIV. A. 95-0349, 1996 WL 34301203, at *4 (D.D.C. Apr. 17, 1996). Here, an application of either the

7

*Common Cause* factors or the *TRAC* factors demonstrates that the FEC has failed to act expeditiously, rendering its failure contrary to law.

> **1. Plaintiffs' Administrative Complaints State Credible, Well-Supported Allegations.**

First, Plaintiffs' administrative complaint and amended complaint state credible and amply supported allegations. *See Common Cause*, 489 F. Supp. at 744 (factor 1). In *Citizens for Percy '84 v. FEC*, No. 84-cv-2653, 1984 WL 6601, at *4 (D.D.C. Nov. 19, 1984), the court found the allegations credible where the plaintiff waited to file the complaint until after it had "amassed a considerable amount of evidence" and the complaint contained documentation of the amounts spent and the purposes of the spending. *Id.* Given this, the *Percy* Court found that the "evidence provided by the plaintiffs in the complaint was more than sufficient to guide the FEC's investigations as well as underscore the credibility of the allegations." *Id.*

Likewise, here, CREW's complaint provides extensive, reliable evidence to guide the FEC's investigation and establish the credibility of the allegations. CREW's administrative complaint and amended administrative complaints cite extensively from the sworn testimony of Missouri political consultant and former-Greitens campaign aide, Michael Hafner, regarding the scheme to use nonprofits and super PACs to hide the identity of donors to Greitens' campaign. Exhibit 1, ¶¶ 19-28; Exhibit 2, ¶¶ 18-32; Exhibit 3, ¶¶ 18-32. To trace the flow of funds, the complaints further cite to the FEC's own records of the specific amounts of contributions and expenditures made by the super PACs, Missouri Ethics Commission contribution reports, and contemporaneous news accounts describing the political contributions. Exhibit 1, ¶¶ 30-45; Exhibit 2, ¶¶ 33-48; Exhibit 3, ¶¶ 33-49. To establish the political advertising expenditures, the complaint details evidence from Missouri Ethics Commission reports, contemporaneous news accounts, and the information the super PACs reported to the FEC. *Id.* By submitting a detailed

and specific compilation of relevant evidence in its administrative complaint, CREW both provided the FEC with guidance to conduct its investigation and left no doubt that its claims deserve to be regarded as credible. Nor has the FEC appeared in this action to dispute the credibility of CREW's claims.

      The assertions made in Plaintiffs' administrative complaints have recently been further corroborated by the Missouri Ethics Commission. Following receipt of a complaint, the Missouri Ethics Commission investigated numerous allegations against the Greitens campaign for the Missouri governorship ("Greitens Campaign") relating to failure to report contributions from a super PAC and a non-profit organization. Joint Stipulation of Facts, Waiver of Hearing Before the Missouri Ethics Commission, and Consent Order with Joint Proposed Findings of Fact and Conclusions of Law, at 2, ¶¶ 67, 72, *Missouri Ethics Commission v. Greitens for Missouri*, No. 18-0064 & 18-0065 (Mo. Ethics Comm'n Feb. 13, 2020), *available at* https://bit.ly/2IQ71jR. At the conclusion of its investigation, the Missouri Ethics Commission and Greitens for Missouri stipulated, *inter alia*, that contributions from Freedom Frontier to LG PAC "appear to correlate to LG PAC's media buys" and that LG PAC's media buys constituted an in-kind contribution to Greitens for Missouri, which the campaign failed to report. *Id.* ¶¶ 21, 41-43. The Missouri Ethics Commission further found probable cause to believe that the Greitens campaign violated Missouri law by accepting in-kind contributions from another non-profit corporation, A New Missouri, as well as a polling data organization. *Id.* ¶ 72. The Greitens Campaign agreed to pay fines totaling over $178,000 as part of the consent order resolving the allegations, though the order stipulates that upon timely payment of $38,000, the rest will be stayed. *Id.* at 16, III.c.-d. While the results of the state investigation were not available to the FEC during the time when it

failed to act, they serve to corroborate and bolster the credibility of Plaintiffs' allegations that were before the FEC.

### 2. The Threat to the Electoral System Posed by the FEC's Delay in Investigating the Scheme is Significant and Ongoing.

Second, the nature of the threat posed by the FEC's failure to act on CREW's claims is significant. *Common Cause*, 489 F. Supp. at 744 (factor 2); *TRAC*, 750 F.2d at 80 (factor 3). In analyzing this factor, courts look at both the significance of the threat and the likelihood that illegal activity will continue. *See Percy*, 1984 WL 6601, at *3; *DSCC*, 1996 WL 34301203, at *5 ("The threat to the electoral system is highlighted not only by the amounts of money involved and the impact upon close elections, but by the serious threat of recurrence.").[3]

CREW's allegations that the Greitens Campaign engaged in a deliberate scheme to hide the true source of over $6 million in campaign spending presents an ongoing threat to the integrity of the electoral process. Deliberately hiding the true source of campaign funds is conduct contrary "to the principal purpose of FECA," *DSCC*, 1996 WL 34301203, at *5, to ensure voters know "who is speaking about a candidate . . . before an election," *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). Disclosure is crucial to allow "citizens [to] see whether elected official are 'in the pocket' of so-called moneyed interests," *id*. at 370, and to prevent "corruption and avoid the appearance of corruption," *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976).

The purpose of the FEC disclosure regime is not simply to punish the bad actors, such as the Greitens campaign and the nonprofits and super PACs involved in the scheme, but also to

---

[3] In *TRAC*, the court noted that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." 750 F.2d at 80 (citations omitted). Here, the injury is to the wellbeing of the body politic, to the integrity of the electoral process, and, ultimately, to the functioning of our democracy, which is certainly more imminent and less tolerable of delay than garden-variety economic threats. *DSSC*, 1996 WL 34301203, at *8 ("threats to the health of our electoral processes also require timely action").

serve the interests of the voters through ensuring disclosure. Here, the FEC's failure to take timely action in this case emboldens the donors who are the true source of the $6 million in political funding to continue harming the interests of voters. Absent FEC action, there is no reason to believe that they will be deterred from continuing to violate the FECA by spending in future elections in the name of another and without disclosing their identities.

### 3. The FEC's Failure to Act Cannot Be Excused by Lack of Information, Resource Constraints, or Competing Priorities.

There is no evidence to suggest that the FEC lacks the resources or information to complete its investigation of Respondents in a timely manner or has competing priorities that would be harmed by moving forward with this matter. *See Common Cause*, 489 F. Supp. at 744 (factor 3); *TRAC*, 750 F.2d at 80 (factor 4). As an initial matter, the FEC has not appeared in this case, so it has not pointed to resource constraints or competing priorities as a potential excuse for its ongoing failure. The FEC has thus failed in its burden to justify delay based on lack of resources, which lies on the agency because "[k]nowledge as to the limits of [agency] resources is exclusively within the control of the Commission." *Citizens for Percy '84*, 1984 WL 6601, at *4. But, even if the FEC pled poverty, "whatever deference an agency is due in resource allocation decisions, it is entitled to substantially less deference when it fails to take any meaningful action within a reasonable time period." *DSCC*, 1996 WL 34301203, at *5-*6.[4]

Further, the FEC has more than enough information available to move forward expeditiously on Plaintiffs' administrative complaint. Plaintiffs' administrative complaint and

---

[4] Furthermore, there is reason for the Court to place little emphasis on this factor, notwithstanding its mention in *Common Cause*, 489 F. Supp. at 744. If the FEC lacks the resources to act, it may choose not to conform to the Court's judgment within thirty days. Failure to conform would simply open the door for a citizens' suit brought by Plaintiffs. *See* 52 U.S.C. § 30109(a)(8)(C). That citizens suit would have no impact on the FEC's resources and would not impact the agency's competing priorities. Indeed, such citizen suits exist to "enforce compliance without federal expense." *Sierra Club v. Whitman*, 268 F.3d 898, 905 (9th Cir. 2001).

amended complaints set forth the allegations in exhaustive detail and provide extensive citation to evidence in support of the factual allegations. *See* Exhibit 1, ¶¶ 30-45; Exhibit 2, ¶¶ 33-48; Exhibit 3, ¶¶ 33-49 (citing FEC forms, newspaper reports, and Missouri Ethics Commission contribution data). Further, much of the evidence comes from the FEC's own records, rendering any claim of lack of access to information unreasonable. *See Citizens for Percy '84*, 1984 WL 6601, at *4 (finding delay unreasonable where "[m]uch of the information in the complaint could be verified from the FEC's own records"). Even if the FEC required additional information, it has now had over 20 months to investigate.[5] Given that the FECA contemplates that "some cases can be dealt with in the 120 day period," a delay of 20 months to gather information is not likely to be reasonable. *See Citizens for Percy '84*, 1984 WL 6601, at *4 ("If not, we fail to understand why Congress created jurisdiction in this court upon the passage of 120 days from filing of the administrative complaint.").

### 4. The Issues Raised Are Far From Novel.

The FEC has recently investigated the very same types of violations that the Plaintiffs raise here, rendering the issues far from novel. *See Common Cause*, 489 F. Supp. at 744 (factor 4). Plaintiffs' administrative complaints raise credible allegations of violations of the statute and regulations against knowingly accepting a contribution made by one person in the name of another, 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b), requiring political committees to report the identity of those who make contributions and anyone who acted as a conduit for the contributions, 52 U.S.C. § 30104(b)(2); 11 C.F.R. § 104.3(a), (j), knowingly permitting one's

---

[5] It is of note that the Missouri Ethics Commission's investigation commenced with a complaint filed on July 10, 2018 and concluded with a Consent Order dated February 13, 2020. Accordingly, the state investigation regarding substantially similar allegations proceeded from complaint to consent order in less time than the FEC has been inactive with regard to Plaintiffs' administrative complaints. *See* Joint Stipulation, *Missouri Ethics Commission v. Greitens for Missouri*.

name to be used to affect a contribution in the name of another or knowingly helping or assisting any person in doing so, 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b), and making a contribution in the name of another person, 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b). None of these are novel provisions and each have been the subject of recent FEC action.

In *In the Matter of American Conservative Union, et. al ("ACU")*, the FEC investigated a conduit contribution scheme, as detailed in an administrative complaint filed by CREW. Complaint, *In re American Conservative Union, et al.*, MUR No. 6920 (Feb. 27, 2015), *available at* https://bit.ly/2wwaX6y. This scheme was similar to the present case in that it likewise involved funneling money from donors who wished to remain hidden, through a 501(c)(4) social welfare organization to a super PAC. *Id.* ¶¶ 13-20. CREW's administrative complaint in *ACU* alleged violations of the same statutes and regulations at issue in the above-captioned suit. The FEC's Office of General Counsel analyzed these provisions at length in the course of three Office of General Counsel reports. *Id.*, First General Counsel's Report (Jan. 20, 2016), *available at* https://bit.ly/2W1N6GD; Second General Counsel's Report (July 5, 2017), *available at* https://bit.ly/2VP7H0t; Third General Counsel's Report (Sept. 15, 2017), *available at* https://bit.ly/2TrWJfW. Following three detailed Office of General Counsel reports, the FEC ultimately found probable cause to believe that ACU violated 52 U.S.C. § 30122 and that other respondents violated 52 U.S.C. §§ 30122 and 30104(b)(3)(A) and authorized a conciliation agreement that resulted in the payment of a $350,000 fine. *Id.*, Conciliation Agreement (Nov. 3, 2017), *available at* https://bit.ly/2PSntE8. *See also* First General Counsel's Report, *In re Prakazrel "Pras" Michel, et al.*, MUR No. 6930 (Nov. 19, 2015), *available at* https://bit.ly/33ihAph (analyzing complaint regarding alleged conduit contribution scheme and recommending, based on facts, no finding of reason to believe a violation had occurred).

Given the similarities of the accusations and the extensive work that the FEC has already done to research and familiarize itself with the relevant law and regulations, along with the fact that the regulations at issue date back to the 1980s, it cannot be said that the current case is so novel as to justify the ongoing delay.

> 5. **Continued, Unexplained Delay Violates the "Rules of Reason" and Is Out-of-Sync with the FECA's Statutory Timetable.**

Continued delay runs contrary to the "rule of reason" and Congress's intent as evidenced through the statutory timetable. *TRAC*, 750 F.2d at 80 (factors 1, 2). The "rule of reason . . . assumes that an agency matter "will be finally decided within a reasonable time encompassing months, occasionally a year or two, but not several years or a decade." *Rose v. Federal Election Comm'n*, 608 F. Supp. 1, 10 (D.D.C. 1984), *on remand from In re Nat'l Congressional Club*, Nos. 84-5701, 84-5719, 1984 WL 148396 (D.C. Cir. Oct. 24, 1984). Here, we are fast-approaching the two-year mark with no evidence from the FEC that it has taken any substantive action to advance the investigation called for by Plaintiffs' administrative complaint. Furthermore, the current lack of a quorum at the FEC guarantees that it is unable to take any meaningful action to advance an investigation into Plaintiffs' complaint, and its history of deadlocking on substantial votes indicates that it might not take action in a reasonable time even if it had a quorum.

While Congress "did not impose specific constraints upon the Commission to complete final action, . . . it did expect that the Commission would fulfill its statutory obligations so that [FECA] would not become a dead letter." *DSCC*, 1996 WL 34301203, at *7. To this end, the language of the FECA, which contains many "*short* deadlines governing the speed with which such complaints must be handled," *Rose*, 608 F. Supp. at 11 (emphasis in original), evidences an expectation of movement within a reasonable time. In fact, "some cases can be dealt with in the

14

120 day period" proscribed by the FECA, *Citizens for Percy '84*, 1984 WL 6601, at *4, and there is no reason to believe that this should not have been one such case.

Here, Plaintiffs filed their administrative complaint over 20 months ago and have received no communication from the FEC since it acknowledged receipt of that complaint on July 6, 2018. (Facts ¶¶ 1, 5, 6). The FEC's failure to appear in this case deprives this Court and the Plaintiffs of any further insight into the FEC's process. Given this, there is no evidence to suggest that the FEC has taken meaningful action on the administrative complaint.

Furthermore, the FEC's current lack of a quorum precludes them from taking actions crucial to authorizing and advancing any investigation regarding the allegations in the administrative complaint.[6] Thus, even absent any information from the FEC, it is evident that, unless or until further commissioners are confirmed by the Senate, no meaningful action can take place. *See* Facts ¶ 10 (lack of a quorum).[7] Accordingly, this factor mediates in favor of a finding that the FEC's delay is unreasonable and confirms that the delay is likely to continue.

---

[6] For example, when the FEC receives a complaint, it must first consider whether it has "reason to believe" that a person has violated or is about to violate the FECA, and an investigation may proceed only if at least four commissioners find reason to believe. 52 U.S.C. § 30109(a)(2); Directive 10 (enumerating actions FEC may take absent a quorum). Following a "reason to believe" vote, the FEC's Office of General Counsel prepares a report in preparation for a vote on whether probable cause exists to believe a violation has occurred. The "probable cause" vote also cannot take place absent a quorum. 52 U.S.C. § 30109(a)(4)(A)(i); Directive 10. If the FEC votes to find that probable cause exists, then the Commission must attempt to resolve the violation by informal methods and enter into a conciliation agreement with the offending party. The FEC needs a vote of four members, constituting a quorum, to enter into a conciliation agreement. 52 U.S.C. § 30109(a)(4)(A)(i); Directive 10. If a conciliation agreement is insufficient to "correct or prevent violation" of the FECA, then the FEC may institute a civil action. Again, however, a vote of four members is required to take this step. 52 U.S.C. § 30109(a)(6)(A); Directive 10. In fact, the only meaningful action that can take place on a complaint absent a quorum is for the complainant to file suit in federal court to challenge the FEC's failure to act on the complaint. 52 U.S.C. § 30109(a)(8).

[7] James E. Trainor III has been nominated to the Commission but has not been confirmed. *See* 166 Cong. Rec. S1236 (daily ed. Feb. 27, 2020) (executive nominations receive by the Senate).

### 6. The FEC's Delay Prejudices Plaintiff and Gives Rise to the Appearance of Impropriety.

Plaintiffs and voters will be and have been severely prejudiced by the FEC's inability to proceed with its investigation of the Respondents, and this delay, much of which occurred before the FEC lost a quorum, gives rise to the appearance of agency impropriety. *See TRAC*, 750 F.2d at 80 (factors 5 and 6). The fact that the elections in which the Respondents illegally funneled money through nonprofits to benefit the Greitens campaign and hide the entity of donors have passed "does not make the 'nature' or 'extent' of the threat any less significant." *Rose*, 608 F. Supp. at 12. Rather, absent enforcement, there is no reason to believe that the same donors, entities, and treasurers who sought to hide their identities and perpetrate this scheme in this instance will not be empowered to do so again, despite the illegality, in future elections. Furthermore, the continued and excessive delay in all enforcement gives rise to an appearance of agency impropriety.

The FEC lost quorum on September 1, 2019, nearly 14 months after Plaintiffs filed the original administrative complaint. Facts ¶¶ 5, 10. Thus, a substantial delay had already occurred prior to the loss of a quorum, and that delay gives rise to the appearance of agency impropriety. *See TRAC*, 750 F.2d at 80. To be sure, "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed, *id.* (internal quotation marks omitted), so the Court need not reach this factor to find the FEC's failure to act contrary to law, *see Rose*, 209 F. Supp. at 12 ("[T]he Court need not and does not make such findings."). Here, however, the regular practice of the FEC has become one of inaction and enforcement deadlock. Because, as detailed in section II.B.5, above, an affirmative vote of four commissioners is required to take actions such as issuing subpoenas or finding "reason to believe" that a violation may have occurred, deadlocked votes can and do result in delays at

16

nearly all substantive stages in the FEC enforcement process. As then-FEC Chair Ellen L. Weintraub stated in her 2019 End of Year Report, "the Commission frequently closed matters without so much as making a phone call to investigate potential wrongdoing." Facts ¶ 12. With regard to enforcement matters, many "languished for months or years at the request of [her] Republican colleagues, causing some to near the end of their statutory limitations, only for these Commissioners to then decline to investigate at all," including "some of the most alarming allegations of campaign-finance violations [the FEC] considered in 2019." *Id.*

This pattern of inaction and enforcement deadlock started long before CREW filed the complaint at issue in this case. In 2017, then-Commissioner Ann M. Ravel released a report entitled: *Dysfunction and Deadlock: The Enforcement Crisis at the Federal Election Commission Reveals the Unlikelihood of Draining the Swamp*. Facts ¶ 14. In this extensive report, Commissioner Ravel detailed the alarming increase in gridlock and decrease in enforcement at the FEC. From 2006 to 2016, the number of deadlocked votes increased more than ten-fold from just 2.9% of substantive votes to over 37% of substantive votes in enforcement matters closed in 2016. Facts ¶ 15.a. at 1. When a vote deadlocks, the result is that enforcement cannot move forward. *See generally*, 52 U.S.C. § 30109. As a result of the dramatic increase in deadlocked votes, enforcement has dropped precipitously, as demonstrated by the nearly ten-fold decrease in fines levied. In 2006, the FEC levied more than $5.5 million in enforcement fines, while in 2016, that had dropped to less than $600,000 in enforcement fines. Facts ¶ 15.a. at 2.

Accordingly, for years prior to the loss of a quorum, enforcement has declined significantly due to agency deadlock, resulting in both lack of enforcement and increasing delays in enforcement. The persistent deadlock gives rise to the appearance of agency impropriety and is now compounded by the loss of a quorum. These factors combine to severely prejudice the

ability of Plaintiffs to have their complaint fairly reviewed, investigated, and acted upon by the FEC.

### III. Conclusion

Accordingly, Plaintiffs respectfully request that the Court enter judgment that the FEC's failure to act is contrary to law and assess $400 in court costs, pursuant to 28 U.S.C. § 1920.

Respectfully submitted,

*/s/ Laura C. Beckerman*
Laura C. Beckerman
(D.C. Bar No. 1008120)
Stuart McPhail
(D.C. Bar No. 1032529)
Citizens for Responsibility and Ethics
  in Washington
1101 K Street, N.W., Suite 201
Washington, DC 20005
Phone: (202) 408-5565
Fax: (202) 588-5020
lbeckerman@citizensforethics.org

**Certificate of Service**

I certify that on March 16, 2020, I caused service of the Request for Entry of Default and attachments to be made on defendant Federal Election Commission by U.S.P.S. First Class Mail as follows:

Federal Election Commission
1050 First Street, N.E.
Washington, DC 20463

*/s/ Laura C. Beckerman*
Laura C. Beckerman
