EXHIBIT

3

**CREW** | citizens for responsibility and ethics in washington

November 20, 2018

Federal Election Commission
Office of Complaints Examination
  and Legal Administration
1050 First Street, N.E.
Washington, D.C. 20002

Re:   MUR 7422/Amended Complaint

Dear Sir or Madam:

Please find under cover of this letter an amended complaint in MUR 7422. We file this amended complaint to supplement the information complainants provided in CREW's original complaint, dated June 27, 2018. In the time during which CREW's complaint has been pending, new information relevant to CREW's original complaint has come to light, necessitating an update to the complaint. CREW submits this amended complaint to add this new information. Accordingly, the amended complaint includes new allegations (*see* Am. Compl. ¶¶ 34 n.2, 36 n.3, 43, 47, 48, and 49). The exhibits to the amended complaint are identical to the exhibits to the original complaint and are incorporated therein, but, in the interest of not duplicating copies in the administrative record, CREW has not resubmitted the exhibits.

In addition, please note the changed address below. Please use the new address in any further correspondence.

Sincerely,

Noah Bookbinder
Executive Director Executive Director
Citizens for Responsibility and Ethics
  in Washington
1101 K Street, N.W., Suite 201
Washington, D.C. 20005
(202) 408-5565 (phone)
(202) 588-5020 (fax)
nbookbinder@citizensforethics.org

Encls.

FEDERAL ELECTION COMMISSION

In the matter of:

SEALs for Truth                                                      MUR 7422
Nicholas Britt, Treasurer, SEALs for Truth
American Policy Coalition, Inc.
LG PAC
Richard Monsees, Treasurer, LG PAC
Freedom Frontier
Unknown Respondents

AMENDED COMPLAINT

1.        Citizens for Responsibility and Ethics in Washington ("CREW") and Noah

Bookbinder bring this amended complaint before the Federal Election Commission ("FEC" or

"Commission") seeking an immediate investigation and enforcement action against SEALs for

Truth, Nicholas Britt, American Policy Coalition, Inc., LG PAC, Richard Monsees, Freedom

Frontier, and Unknown Respondents for direct and serious violations of the Federal Election

Campaign Act ("FECA").

2.        The FECA prohibits making and knowingly accepting a contribution in the name

of another person, as well as knowingly permitting one's name to be used to effect a contribution

in the name of another person. This complaint concerns a deliberate effort to use federal super

PACs and nonprofit organizations to execute a conduit contribution scheme in order to conceal

the identity of donors supporting the election of now-former Missouri Gov. Eric Greitens in

2016.

3.        This scheme to circumvent disclosure was hatched by Mr. Greitens' campaign

and his supporters in early 2015. As shown in the sworn testimony of one of Mr. Greitens'

campaign aides and in evidence collected by an investigative committee of the Missouri House

1

of Representatives, the plan they devised involved using nonprofit organizations that are not required to disclose their donors to accept contributions of money to be spent supporting the campaign. The scheme, executed in the summer of 2016, involved routing more than $6 million through two nonprofits, American Policy Coalition and Freedom Frontier, to two federal super PACs, SEALs for Truth and LG PAC. SEALs for Truth in turn directly contributed $1.975 million to Mr. Greitens' campaign, while LG PAC spent more than $4.3 million on advertisements and other media attacking Mr. Greitens' opponents and supporting his candidacy. All of these groups were closely connected to the Greitens campaign and to each other, sharing consultants and officers.

4.      By using federal rather than state-based super PACs to funnel money into the Missouri gubernatorial election, Mr. Greitens' supporters were able to deny Missouri voters timely information about the identities of those trying to influence the gubernatorial election. And routing the money through nonprofits and super PACs ensured that the ultimate source of the funds boosting Mr. Greitens would remain secret. These apparent violations of law deprive the public of important information and demand investigation.

<u>Complainants</u>

5.      Complainant CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW is dedicated to empowering voters to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission.

6.     In furtherance of its mission, CREW seeks to expose unethical and illegal conduct of those involved in government. One way CREW does this is by educating citizens regarding the integrity of the electoral process and our system of government. Toward this end, CREW monitors the campaign finance activities of those who run for federal and state office and publicizes those who violate federal campaign finance laws through its website, press releases, and other methods of distribution. CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing campaign finance violators and filing complaints with the FEC serve CREW's mission of keeping the public informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance law.

7.     In order to assess whether an individual, candidate, political committee, or other regulated entity is complying with federal campaign finance law, CREW needs the information contained in receipts and disbursements reports that political committees and others must file pursuant to the FECA, 52 U.S.C. § 30104; 11 C.F.R. §§ 104.1–22, 109.10. CREW is hindered in its programmatic activity when an individual, candidate, political committee, or other regulated entity fails to disclose campaign finance information in reports of receipts and disbursements required by the FECA.

8.     CREW relies on the FEC's proper administration of the FECA's reporting requirements because the FECA-mandated disclosure reports are the only source of information CREW can use to determine if an individual, candidate, political committee, or other regulated entity is complying with the FECA. The proper administration of the FECA's reporting requirements includes mandating that all disclosure reports required by the FECA are properly

3

and timely filed with the FEC. CREW is hindered in its programmatic activity when the FEC fails to properly administer the FECA's reporting requirements.

9.      Complainant Noah Bookbinder is the executive director of Citizens for Responsibility and Ethics in Washington. At all times relevant to the complaint, he has been and remains a citizen of the United States and a registered voter and resident of Maryland. As a registered voter, Mr. Bookbinder is entitled to receive information contained in disclosure reports required by the FECA, 52 U.S.C. § 30104; 11 C.F.R. §§ 104.1–22, 109.10. Mr. Bookbinder is harmed in exercising his right to vote when an individual, candidate, political committee, or other regulated entity fails to report campaign finance activity as required by the FECA. *See FEC v. Akins,* 524 U.S. 11, 19 (l998), *quoting Buckley v. Valeo,* 424 U.S. 1, 66-67 (l976) (political committees must disclose contributors and disbursements help voters understand who provides which candidates with financial support). Mr. Bookbinder is further harmed when the FEC fails to properly administer the FECA's reporting requirements, limiting his ability to review campaign finance information.

10.     Mr. Bookbinder also is harmed in his ability to communicate to the public and to other voters information about the source of funds used for political activities.

<u>Respondents</u>

11.     SEALs for Truth is a federal independent-expenditure only committee ("super PAC") formed under the FECA in June 2016. SEALs for Truth, <u>FEC Form 1, Statement of Organization</u>, June 15, 2016, <u>https://bit.ly/2rRu4m5</u>.

12.     Nicholas Britt is the treasurer of SEALs for Truth. *Id*.

13.     American Policy Coalition, Inc. is a tax-exempt organization, organized under

section 501(c)(4) of the Internal Revenue Code. It was established in Kentucky in 2011 as BluegrassVotes.org, Inc. BluegrassVotes.org, Inc., Articles of Incorporation, Kentucky Secretary of State, Aug. 30, 2011, https://bit.ly/2JXJQ9g, and changed its name to American Policy Coalition in November 2015. BluegrassVotes.org, Inc., Articles of Amendment, Kentucky Secretary of State, Nov. 17, 2015, https://bit.ly/2rSIAdw.

14. LG PAC is a federal independent-expenditure only committee formed under the FECA in May 2016. LG PAC, FEC Form 1, Statement of Organization, May 16, 2016, https://bit.ly/2rRyLMJ.

15. Richard "Hank" Monsees is the treasurer of LG PAC. LG PAC, FEC Form 1, Statement of Organization, Amended, June 6, 2016, https://bit.ly/2wQlzg0; James Dornbrook, Local PAC received $1.5M donation, but its goals remain secret, *Kansas City Business Journal*, Oct. 31, 2016, https://bit.ly/2Le30Wt.

16. Freedom Frontier is a tax-exempt organization, organized under section 501(c)(4) of the Internal Revenue Code. It was established in Texas in 2011. Freedom Frontier, 2015 Form 990, Amended, https://bit.ly/2tajxC.

17. Unknown Respondents are the individuals who are the true sources of funds American Policy Coalition transferred to SEALs for Truth and Freedom Frontier transferred to LG PAC, as well as any individual(s), entity, or entities that served as conduits through which such funds passed before reaching American Policy Coalition and Freedom Frontier.

<u>Factual Allegations</u>

*The Plan to Conceal Donor Identities*

18. Michael Hafner is a Missouri-based political consultant.

19.     Mr. Hafner worked as an informal political advisor to Mr. Greitens between December 2013 and January 2015, as Mr. Greitens developed his plans to run for office. Transcript of interview with Michael Hafner, Missouri House of Representatives Special Investigative Committee on Oversight, Mar. 14, 2018, Tr. 6:9-17, https://bit.ly/2IN2hND ("Hafner Tr."). Mr. Hafner started working for Mr. Greitens in a paid capacity in January 2015. *Id*. Tr. 7:3-8. After Mr. Greitens officially launched his campaign in February 2015, Mr. Hafner was compensated by Greitens for Missouri for his work. Greitens for Missouri, Missouri Ethics Commission April Quarterly Report, Apr. 15, 2015, https://bit.ly/2wZqZFU.

20.     After leaving the Greitens campaign in March 2015, Mr. Hafner later joined the campaign of one of Mr. Greitens' opponents in the Republican gubernatorial primary, John Brunner. Hafner Tr. 93:15-20.

21.     On March 14, 2018, the Missouri House of Representatives Special Investigative Committee on Oversight interviewed Mr. Hafner under oath about allegations that Mr. Greitens used a list of charitable donors for campaign fundraising purposes during his 2016 gubernatorial campaign. *See generally,* Hafner Tr.; Report 2 of the Missouri House Special Investigative Committee on Oversight, Apr. 24, 2018, https://bit.ly/2LeYXcj. Mr. Hafner was interviewed again by the committee, also under oath, on May 29, 2018. Video of Missouri House of Representatives Special Investigative Committee on Oversight Hearing – Tuesday, May 29, 2018, https://bit.ly/2Jq9jbu ("Hafner Video").

22.     During the interviews, Mr. Hafner revealed the scheme to conceal donor identities during the gubernatorial campaign. When asked whether, based on his work on the Greitens campaign, Mr. Hafner believed that "there was a strategy employed to conceal donors," he

testified, "I believe that was an intention of the campaign's early on." Hafner Tr. 45:1-5. Mr. Hafner said the strategy was "intended to get a group of people that didn't want to disclose who they were" to contribute "individually or through their companies" by giving "directly to a certain entity," which he described as a "freedom group," in a "way that conceals donors." *Id*. at 62:23-64:6. Nonprofits and section 501(c)(4) social welfare organizations were discussed as vehicles for concealing donors, Mr. Hafner also testified, saying, "there were specific donors that I reached out to, who [Mr. Greitens] connected me with, and we discussed specifically nonprofits and c4s, and what the process would be to establish entities like that to accept contributions, for bundling contributions." Hafner Video, at 1:53:57.

23.     Mr. Hafner further testified that he was led to believe campaign staff would coordinate with donors seeking to support the Greitens campaign while remaining anonymous, saying, "I had had conversations with people associated with [Mr. Greitens] in January and February and March when I was employed and working out of that office that I knew that I was led to believe that . . . they were planning on concealing donors in some way or having people . . . on their campaign having staff associated with on their campaign reach out and coordinate donors" who would support the campaign while being kept secret. Hafner Tr. 116:3-10.

24.     Mr. Hafner said that Mr. Greitens directed him "to have conversations with donors who intended to raise significant amounts of money and conceal the donors, conceal the identity of those donors." *Id*. at 40:22-25. In particular, Mr. Hafner said he had two phone conversations with a donor named Monu Joseph who "wanted to discuss with me how the campaign was going to bundle contributions and conceal the identity of donors." *Id*. at 41:9-11. According to Mr. Hafner, he "was connected with Monu, who was planning on raising a

7

substantial amount of money for the campaign. I think somewhere between 250 and half a million dollars. And my conversations with him, he wanted to know if there were avenues set up where, that were nonprofits or c4s, that they could bring money in and not disclose the source of those contributions." Hafner Video, at 1:58:40. Mr. Hafner also said he had contact with other individuals who were discussing ways to conceal donations and that he had conversations with Mr. Greitens "about reaching out to specific donors who were intending to raise a lot of money and wanting to know how to do it." Hafner Tr. 43:11-13.

25.    Mr. Hafner also testified about possible motivations for the scheme to set up entities to conceal the identity of donors. In one interview, Mr. Hafner commented on "a memo developed on people in financial services contributing" to Mr. Greitens' campaign, which he said would have been sent to Mr. Joseph. Acknowledging that people in the financial services industry are sometimes referred to as restricted donors due to Securities and Exchange Commission regulations, Mr. Hafner said Mr. Joseph "had a lot of contacts in that world and wanted to look at avenues for ways that they could contribute." Hafner Video, at 1:08:16. The Greitens campaign's interest in courting restricted donors was confirmed by evidence gathered and publicly released by the Missouri House of Representatives Special Investigative Committee on Oversight. In a December 4, 2015 e-mail exchange obtained by the committee, the Greitens campaign's finance director, Meredith Gibbons, wrote to Greitens campaign consultant Nick Ayers about a "restricted donor" that the campaign wanted him to "reach out to." Complaint Against Greitens for Missouri, and A New Missouri, Inc. for Violations of Missouri Campaign Finance Law, submitted by Missouri state Rep. Jay Barnes to the Missouri Ethics Commission, July 10, 2018, at 20, *available at* https://bit.ly/2NdCtc3 ("Barnes Complaint"). Mr. Ayers wrote

that he would "buzz" her soon regarding the "restricted donor." *Id.*

26.     Mr. Hafner also said "there were conversations that we had where foreign money was discussed, where foreign money was discussed, and the possibility of foreign money, you know, being contributed to an entity. There were those discussions that were being had in the early stages." Hafner Video, at 1:56:17.[1]

27.     Mr. Hafner further said that because at the time of the 2016 gubernatorial election there were no contribution limits in Missouri, he believed there could only be "one reason" to set up "another entity" outside of the candidate's campaign committee that "could accept unlimited contributions" and "that's to conceal the identity of a specific donor or groups of donors." Hafner Interview, at 2:59:30.

28.     Though Mr. Hafner left the Greitens campaign in March 2015, evidence collected by the Missouri House of Representatives Special Investigative Committee on Oversight shows that the Greitens campaign continued to discuss routing donors whose identities they wanted to conceal for political or legal reasons to section 501(c)(4) nonprofits that are not required to disclose their donors. On July 10, 2018, Missouri state Rep. Jay Barnes (R), who served as the chairman of the Missouri House of Representatives Special Investigative Committee on

---

[1] Mr. Hafner acknowledged that he had no "direct knowledge" of any contributions by foreign nationals being made to the Greitens campaign since he left the campaign in its early stages. Hafner Video, at 3:47:45. However, he testified he had discussions related to two individuals associated with Mr. Greitens regarding foreign contributions. Hafner Video, at 3:00:43. First, he said one discussion involved Mr. Joseph indicating to Mr. Hafner that he and Mr. Greitens "had a lot of buddies" from Oxford University, where "most" of the students are not American citizens, that "were interested in contributing to the race." *Id.* According to Mr. Hafner, Mr. Joseph "specifically asked about how, what would be the way to get, you know, foreign money, contributions from abroad, into the campaign." *Id.* at 4:23:16. Second, Mr. Hafner testified that the other discussion involved an associate of Mr. Greitens who lived in Hong Kong and had made commitments "early on in the campaign to contribute a lot of money and to raise a lot of money." *Id.* at 3:00:43. Mr. Joseph's attorney denied Mr. Hafner's account, telling the *Columbia Daily Tribune* that "at no time did Mr. Joseph request donations from anyone living abroad, U.S. citizens or otherwise." Rudi Keller, Greitens campaign sought foreign contributions, consultant testified, *Columbia Daily Tribune*, May 3, 2018, https://bit.ly/2HV4TZW.

Oversight that investigated Mr. Greitens, filed a complaint with the Missouri Ethics Commission alleging that Mr. Greitens' campaign committee, Greitens for Missouri, and a nonprofit group that his aides formed after his election, A New Missouri, Inc., had violated Missouri campaign finance law. Barnes Complaint. In the complaint, Rep. Barnes wrote that evidence obtained by the committee "strongly suggests that Greitens for Missouri engaged in activity purposefully designed to conceal donor identities." *Id*. at 17.

29.     That evidence includes a November 17, 2015 email sent by Greitens campaign manager Austin Chambers in which he discussed potential donors to the campaign who were Democrats. "If they want to give, C4 would probably be better so that they don't appear on our reports," Mr. Chambers wrote. *Id*. at 19. A second email exchange similarly shows an intent to use a nonprofit organization to keep donors secret. On June 27, 2016, "an early supporter and fundraiser" of Mr. Greitens emailed the campaign's finance director, Ms. Gibbons, about an individual who the fundraiser believed was "not allowed to give" money to the Greitens campaign "due to compliance reasons" because the individual "manages money for the state of Missouri." *Id*. at 21. The fundraiser advised Ms. Gibbons that Mr. Greitens could "mention the 501(c)(4) if applicable[.]" *Id*. As Rep. Barnes noted in his complaint, two days after the fundraiser emailed Ms. Gibbons suggesting Mr. Greitens could "mention the 501(c)(4)" to an apparently restricted donor, Freedom Frontier, a section 501(c)(4) organization, contributed $500,000 to a super PAC that spent millions to support Mr. Greitens' campaign. *Id*. at 26.

30.     Mr. Hafner testified that he believed the scheme was carried out. Hafner Tr. 45:6-7. During his testimony, he referenced both SEALs for Truth and LG PAC when asked about politically-active entities whose donors are not publicly identified. "There's the other element to

it that, yeah, I don't think anyone's aware other than internally those organizations, how much money they raised and spent. And I'm referring to, you know, the SEALs for Truth, which we don't know where that money came from. That was disclosed in [Missouri Ethics Commission filings], but the way they did it was, I think, through a super PAC which then contributed to the [Greitens campaign committee]. And then the LG PAC, which was making enormous expenditures in that race and that was routed through ghost corporations in Texas, I think." Hafner Video, at 2:58:00. Mr. Hafner also appeared to refer to the two federal super PACs funded by nonprofits in an interview with *St. Louis Public Radio* when he estimated that Mr. Greitens "had (at least) $6 million in untraceable money" that supported his campaign. Jo Mannies and Jason Rosenbaum, Former aide says Greitens relied on charity donor list, 'dark money' to kick-start campaign, *St. Louis Public Radio*, May 9, 2018, https://bit.ly/2L93uNn.

31.     Mr. Hafner's estimate of "$6 million in untraceable money" corresponds with the support Mr. Greitens received from SEALs for Truth and LG PAC, which combined raised $6.395 million solely from nonprofits that do not disclose their donors and spent almost all of that sum to boost Mr. Greitens' campaign. SEALs for Truth, Receipts, 2015-2016, Federal Election Commission, https://bit.ly/2L9nhw6; LG PAC, Receipts, 2015-2016, Federal Election Commission, https://bit.ly/2Izn2c2; Jason Hancock, Greitens campaign adviser linked to nonprofit that funded attacks against GOP rivals, *Kansas City Star*, Dec. 18, 2017, https://bit.ly/2kkKsI9.

32.     As explained below, supporters of Mr. Greitens' campaign appear to have executed the planned conduit contribution scheme in mid-2016.

*American Policy Coalition/SEALs for Truth*

33.     On July 18, 2016, American Policy Coalition transferred $2 million to SEALs for

Truth. SEALs for Truth, <u>FEC Form 3X, October Quarterly Report</u>, Oct. 14, 2016,

https://bit.ly/2IQshHW. That same day, SEALs for Truth contributed $1.975 million to Greitens

for Missouri. Greitens for Missouri, Missouri Ethics Commission 48 Hour Report of

Contribution Received Over $5,000, July 18, 2016, https://bit.ly/2KAi2oc. The contribution was

described at the time as "by far, the single largest political contribution in Missouri history to an

individual candidate. And we have absolutely no idea who it came from." Kevin McDermott,

<u>Who made the biggest political donation in Missouri history? Ask after the election</u>, *St. Louis*

*Post-Dispatch*, July 20, 2016, https://bit.ly/29XaKZY. The money appears to have been put to

immediate use by the Greitens campaign. On the day of the contribution, the campaign made two

payments totaling a little more than $2 million for "media" to Target Enterprises, a media buying

firm affiliated with Mr. Greitens' general consultant, Mr. Ayers. Greitens for Missouri, Missouri

Ethics Commission 8 Days Before Primary Election - 8/2/2016, July 25, 2016,

https://bit.ly/2rSHfn3; Vicky Ward, <u>Swamp Thing</u>, *HuffPost Highline*, Mar. 15, 2018,

https://bit.ly/2xHeRcV.

34.     Since SEALs for Truth is a federal super PAC and files its disclosure reports with

the FEC rather than the Missouri Ethics Commission, the source of SEALs for Truth's money

was not revealed until after the August 2, 2016 Missouri gubernatorial primary. If SEALs for

Truth had been registered with the Missouri Ethics Commission, it would have been required to

file an 8 Days Before Report on July 25, 2016 that would have disclosed the source of the money

the PAC used for its July 18, 2016 contribution to Greitens for Missouri. Missouri Ethics

Commission 2016 Campaign Finance Filing Requirements and Dates, Missouri Ethics

Commission, June 2015, https://bit.ly/2Jj0Ljn. Instead, American Policy Coalition's $2 million

transfer to SEAL for Truth was not revealed until October 14, 2016, when SEALs for Truth filed

its 2016 October Quarterly report with the FEC. American Policy Coalition was the only

contributor to SEALs for Truth during the relevant reporting period, and the nonprofit group was

responsible for all of the money that was ultimately contributed to Greitens for Missouri.[2]

SEALs for Truth, FEC Form 3X, October Quarterly Report, Oct. 14, 2016,

https://bit.ly/2IQshHW.

35.     Before the nonprofit's contribution was revealed, SEALs for Truth suggested it

had knowledge of the true source of the money that was routed through American Policy

Coalition, saying that the contribution to Greitens for Missouri had largely come from former

Navy SEALs. In an unsigned statement sent to reporters on the day after the contribution was

made, SEALs for Truth claimed it "was formed to support veterans as candidates for public

office" and former Navy SEALs made up "the largest number of donors to our organization."

Jason Rosenbaum, Twitter, July 19, 2016, https://bit.ly/2GvwFGQ. Members of the Greitens

campaign also made statements suggesting they may have had knowledge of the true source of

the money that passed through the federal super PAC. After the contribution was first reported,

Mr. Chambers, Mr. Greitens' campaign manager, told the *St. Louis Post-Dispatch* that "Eric is

---

[2] SEALs for Truth has never reported another contribution other than $152 in unitemized individual contributions.
SEALs for Truth, Financial Summary, 2015-2016, Federal Election Commission, https://bit.ly/2lsHwcN. American
Policy Coalition's contribution to SEALs for Truth accounted for 42 percent of the nonprofit's total expenditures
between October 1, 2015 and September 30, 2016, the group's 2015 tax year. American Policy Coalition, 2015
Form 990, https://bit.ly/2AOWUbJ.

proud to stand with his fellow Navy SEALs, and he is grateful to have their support in this campaign." McDermott, *St. Louis Post-Dispatch*, July 20, 2016.

*Freedom Frontier/LG PAC*

36.     Similar to SEALs for Truth, LG PAC was also completely funded by a nonprofit, thus executing the planned scheme to hide the true source of the funds.[3]  Between June 1, 2016 and July 29, 2016, LG PAC reported contributions totaling $4.37 million from Freedom Frontier. LG PAC, Receipts, 2015-2016, Federal Election Commission, https://bit.ly/2Izn2c2. During that same time, the super PAC reported spending $4.361 million on "media," labeling some of the expenditures as for a "state race." LG PAC, Disbursements, 2015-2016, Federal Election Commission, https://bit.ly/2IuTSyK.

37.     The super PAC did not specify which candidates it was supporting or opposing. *Id.* If LG PAC had been registered with the Missouri Ethics Commission rather than the FEC, it would have been required to file reports detailing direct expenditures made to support or oppose a candidate. Political action committees registered in Missouri, which are known as continuing committees, are required to report expenditures made on behalf of a candidate or ballot measure issue, detailing the candidate's name and address, the office sought, whether the expenditure was in support of or opposition to the candidate, the expenditure date, and the expenditure amount. Missouri Ethics Commission Campaign Finance (Candidates/Committees) Frequently Asked Questions, Missouri Ethics Commission, May 2, 2016, https://bit.ly/2J8oCpI; Blank Committee Disclosure Report, Missouri Ethics Commission, https://bit.ly/2sE0oIQ. Despite the fact that LG

---

[3] LG PAC never reported another contributor other than $4 in unitemized individual contributions. LG PAC, Financial Summary, 2015-2016, https://bit.ly/2Kd0hyD. Freedom Frontier's contributions to LG PAC accounted for 74 percent of the nonprofit's total expenditures in 2016. Freedom Frontier, 2016 Form 990, https://bit.ly/2yWGywr.

PAC was spending in a state race, because it registered as a federal super PAC the organization shielded itself from the level of disclosure required of Missouri state continuing committees. Thus, it was not required to disclose the name of the candidates its expenditures targeted and whether they were made in support or opposition.

38.     A week after LG PAC received its first contribution of $1.5 million from Freedom Frontier, *St. Louis Public Radio* reported that the super PAC was spending $1 million on a statewide television ad attacking Mr. Greitens' primary opponent, Republican gubernatorial candidate John Brunner, as a tax dodger. Jo Mannies, You can't find out who paid for new attack ads on Missouri TV. Laws keep them secret., *St. Louis Public Radio,* June 8, 2016, https://bit.ly/2ITmzF9.

39.     An analysis of TV ad spending by the Center for Public Integrity found that LG PAC spent at least $3.9 million on ads in the Missouri gubernatorial race, not including the cost of making ads or of funding ads aired on local cable systems. Missouri leads nation in TV ad spending for governor's race, *Associated Press*, Oct. 13, 2016, https://bit.ly/2KCJ5iS. This included an ad attacking Catherine Hanaway, an opponent of Mr. Greitens, and an ad attacking Mr. Brunner for his allies' supposed "smear campaign" against Mr. Greitens. Tim Curtis, LG PAC sets sights on Hanaway, *The Missouri Times*, July 19, 2016, https://bit.ly/2KElcYj; Jason Rosenbaum, YouTube, July 14, 2016, https://bit.ly/2wUXnsX.

*Ties Between the Greitens Campaign, the Nonprofit Organizations, and the Super PACs*

40.     There are significant ties between Mr. Greitens' campaign, the nonprofit organizations, and the super PACs that together conceived and executed the conduit contribution scheme.

41.     Mr. Ayers, one of Mr. Greitens' top campaign consultants, was directly involved with both the Greitens campaign and Freedom Frontier, the nonprofit that funded LG PAC. Until April 2018, Mr. Ayers owned a political consulting firm called C5 Creative Consulting. Lindsay Wise and Steve Vockrodt, Pence's chief of staff sells consulting firm to GOP 'kingmaker', *McClatchy*, May 4, 2018, https://bit.ly/2IMZ0xP. Greitens for Missouri paid C5 Creative Consulting $30,060 for "media planning" during the 2016 election. Greitens for Missouri, Missouri Ethics Commission 8 Days Before General Election-11/8/2016 Report, Oct. 31, 2016, https://bit.ly/2xBPU2w. Mr. Ayers also formerly was a partner in the media buying firm Target Enterprises, Inc. and maintained a "business partnership" with the company through C5 Creative Consulting. Target Enterprises, Dec. 22, 2014, available at the Internet Archive Wayback Machine, https://bit.ly/2IRWypv; James N. Ayers, Public Financial Disclosure Report, Oct. 19, 2017, Part 4, Line 8 ("Ayers OGE 278e"), https://bit.ly/2wQWWzO. Greitens for Missouri paid Target Enterprises millions of dollars for media work during the 2016 campaign. Kevin McDermott, Greitens pal and 'dark money' expert both involved in record donation – but still no disclosure, *St. Louis Post-Dispatch*, Oct. 26, 2016, https://bit.ly/2LRrvJk.

42.     On July 26, 2017 Mr. Ayers was appointed Assistant to the President and Chief of Staff to the Vice President. Ayers OGE 278e.

43.     In addition to being compensated by Greitens for Missouri, Mr. Ayers, through his firm C5 Creative Consulting, was also paid by Freedom Frontier between 2015 and late 2017. Ayers OGE 278e, Part 4, Lines 15, 18. Mr. Ayers was also compensated by Clark Fork Group, LLC, the company that Freedom Frontier reported to the Internal Revenue Service ("IRS") as its highest compensated independent contractor during 2016. *Id.*, Part 4, Line 22; Freedom Frontier,

2016 Form 990, Part VII, Section B, Line 1. Freedom Frontier reported paying Clark Fork Group, LLC $354,000 for "consulting." *Id.*

44.     Mr. Ayers was also seemingly involved with LG PAC. According to a profile of Mr. Greitens' campaign manager, Mr. Chambers, that featured an interview with Mr. Ayers, Mr. Ayers was both the "general consultant" for the Greitens campaign and also "managed an outside group that spent money in the Greitens race" – presumably LG PAC, the group that spent millions on media and ads supporting Mr. Greitens. Rachael Herndon Dunn, Austin Chambers: Missouri is the backdrop for another national political star, *The Missouri Times*, Dec. 30, 2016, https://bit.ly/2IUess4.

45.     The treasurer of LG PAC, Richard Monsees, further had ties to Mr. Greitens and his campaign. Soon after the super PAC's creation, Mr. Monsees was spotted attending the opening of a Greitens campaign office and speaking to Mr. Greitens at the event, Micheal Mahoney, Man tied to anti-Brunner ad appears at event with Brunner rival, *KMBC 9 News*, June 17, 2016, https://bit.ly/2kgZv53, and a photo of Mr. Monsees was later posted on Facebook that appeared to show him making phone calls for the Greitens campaign at the event. Tim Curtis, New information links LG PAC and Greitens, *The Missouri Times*, June 18, 2016, https://bit.ly/2s2k0WG; Alex Kuehler, Facebook, May 23, 2016, https://bit.ly/2x61jYe. While Mr. Monsees denied that he made phone calls for the campaign, Mr. Greitens' campaign manager told the *Associated Press* that Mr. Monsees "made about 10 calls at the event that day." PAC treasurer denies ties to gubernatorial hopeful Greitens, *Associated Press*, June 21, 2016, https://bit.ly/2s0AQGn.

46.     The treasurer of SEALs for Truth, Nicholas Britt, also had personal connections to Mr. Greitens. Following the revelation that American Policy Coalition was the sole funder of SEALs for Truth, Mr. Greitens encouraged a reporter who asked about the contribution to "reach out to Nick Britt, the treasurer, if you have any questions at all about the filing. Nick was a Navy SEAL, he went through Navy SEAL training with me, and I'm sure he'd be happy to talk with you." Lucas Geisler, Missouri governor candidate addresses $1.9M donation, *KMIZ*, Oct. 22, 2016, https://bit.ly/2k9P7vY.

47.     American Policy Coalition and Freedom Frontier also are significantly connected to each other, with the two organizations reporting to the IRS that they are "related tax-exempt organizations." American Policy Coalition, 2015 Form 990, Schedule R, Part II, Line 1; Freedom Frontier, 2016 Form 990, Schedule R, Part II, Line 1. The two organizations shared officers and directors, with Freedom Frontier's Treasurer, John Jude, also serving as American Policy Coalition's Treasurer, and Freedom Frontier's Secretary, Jim Robey, also serving as American Policy Coalition's President. Freedom Frontier, 2016 Form 990, Part VII, Section A, Lines 1 and 3; American Policy Coalition, 2015 Form 990, Part VII, Section A, Lines 2 and 3. American Policy Coalition also reported contributing $381,000 to Freedom Frontier. American Policy Coalition, 2015 Form 990, Schedule I, Part II, Line 4.

48.     On its 2015 tax return, American Policy Coalition claimed that "American Policy Coalition and Freedom Frontier ceased being related on April 5, 2016." American Policy Coalition, 2015 Form 990, Schedule R, Part VII. Freedom Frontier's 2016 tax return did not, however, make any assertions about ending its relationship with American Policy Coalition. Freedom Frontier, 2016 Form 990. American Policy Coalition's claim that the relationship

between the two groups ended in April 2016 appears to be based on changes the organization made to its officers and directors. Mr. Jude, along with Director Jeremy Hughes and Secretary David R. Langdon, are described as only serving for a "partial year," while Mr. Robey apparently served for a full year. American Policy Coalition, 2015 Form 990, Part VII, Section A, Lines, 1-4. Changes to American Policy Coalition's officers and directors, however, were not reported to the Kentucky Secretary of State until long after the close of the group's 2015 tax year when, in September 2017, the organization submitted a Reinstatement Application and Reinstatement Annual Report that crossed out the names of Mr. Robey, Mr. Jude, Mr. Langdon, and Mr. Hughes, and replaced them with Justin Myers, Steve Fairbank, and Ken Caubble. American Policy Coalition, Inc., Reinstatement Application and Reinstatement Annual Report, Kentucky Secretary of State, Sept. 18, 2017, https://bit.ly/2yWYGpS.

49.     Much of the information about American Policy Coalition's and Freedom Frontier's activities and personnel during the period in which the two nonprofits funded two federal super PACs supporting Mr. Greitens' election with more than $6 million in anonymously-sourced money was unavailable until mid-2018. Both organizations failed to file their required tax returns with the IRS on time. Citizens for Responsibility and Ethics in Washington, CREW files IRS Complaint Against Greitens-Backing Nonprofits, Mar. 22, 2018, https://bit.ly/2IYcirb. American Policy Coalition's tax return covering October 1, 2015 to September 30, 2016, was due February 15, 2017, and Freedom Frontier's tax return covering all of 2016 was due on May 15, 2017. Neither one was filed until 2018. American Policy Coalition, 2015 Form 990; Freedom Frontier, 2016 Form 990. Though American Policy Coalition's 2015 tax return does not contain a signature date, Freedom Frontier's 2016 tax return, which was

prepared by the same paid preparer as American Policy Coalition's, was signed on July 2, 2018,

exactly three days after CREW first announced its administrative complaint to the FEC naming

both American Policy Coalition and Freedom Frontier as respondents. Citizens for

Responsibility and Ethics in Washington, CREW Files FEC Complaint Against Dark Money

Groups That Boosted Greitens Campaign, Jun. 29, 2018, https://bit.ly/2yQXlzY.

<u>Count I</u>

50.     The FECA and FEC regulations prohibit knowingly accepting a contribution

made by one person in the name of another. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b). The FECA

and FEC regulations further require political committees to report the identity of those who make

contributions, as well as anyone who acted as a conduit for a contribution. 52 U.S.C.

§ 30104(b)(2); 11 C.F.R. § 104.3(a), (j) (political committees must report "earmarked

contributions"); *see also Instructions for FEC Form 3X and Related Schedules* at 11 (revised

May 2016), https://bit.ly/2F19VxP (any political committee receiving an earmarked contribution

through conduit entities must "report each conduit through which the earmarked contribution

passed, including the name and address of the conduit, and whether the contribution was passed

on in cash, by the contributor's check, or by the conduit's check"); 52 U.S.C. § 30107(a)(8)

(FEC forms have force of law).

51.     SEALs for Truth and LG PAC, independent expenditure-only political

committees established under the FECA, each violated the prohibition on knowingly accepting a

contribution made by one person in the name of another and their obligations to report the

identity of those who make contributions and anyone who acted as a conduit for a contribution.

The close ties between the Greitens campaign, the nonprofits, and the super PACs suggest that

the violations were both knowing and willful.

52.    At the beginning of Mr. Greitens' campaign for governor, his supporters in and out of the campaign devised a scheme to keep the names of donors secret by routing their contributions through conduits. As detailed above, they planned to "get a group of people that didn't want to disclose who they were" to contribute "individually or through their companies" by giving "directly to a certain entity" in a "way that conceals donors." The plan for the scheme involved establishing "nonprofits and c4s . . . to accept contributions" of money to be spent supporting Mr. Greitens' campaign.

53.    SEALs for Truth executed part of the planned scheme in July 2016. On July 18, 2016, the super PAC accepted a $2 million transfer from American Policy Coalition, a section 501(c)(4) organization that is not required to disclose its donors. On that same day, SEALs for Truth contributed nearly the same amount, $1.975 million, to Greitens for Missouri, concealing the identities of Unknown Respondents who were either the true sources of the money or served as conduits through which the funds passed. Greitens for Missouri appears to have immediately spent the money on media buys supporting the campaign.

54.    Accordingly, SEALs for Truth, by and through its treasurer, Nicholas Britt, knowingly accepted a contribution made by one person in the name of another in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If SEALs for Truth and Mr. Britt's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

55.    SEALs for Truth, by and through its treasurer, Mr. Britt, also failed to report the identities of the true source of contributions and the identities of each conduit for the

21

contributions falsely attributed to American Policy Coalition, violating 52 U.S.C. § 30104(b)(2) and 11 C.F.R. § 104.3(a) and (j). If SEALs for Truth and Mr. Britt's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

56.     LG PAC similarly executed part of the planned scheme in June and July 2016. Between June 1 and July 29, 2016, LG PAC accepted $4.37 million in transfers from Freedom Frontier. During that same period, LG PAC spent $4.361 million on "media" attacking Mr. Greitens' opponents in the Missouri Republican gubernatorial primary as well as defending him against criticism. Routing the money through LG PAC concealed the identities of Unknown Respondents who were either the true sources of the money or served as conduits through which the funds passed.

57.     Accordingly, LG PAC by and through its treasurer, Richard Monsees, knowingly accepted a contribution made by one person in the name of another in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If LG PAC and Mr. Monsees' violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

58.     LG PAC, by and through its treasurer, Mr. Monsees, also failed to report the identities of the true source of contributions and the identities of each conduit for the contributions falsely attributed to Freedom Frontier, violating 52 U.S.C. § 30104(b)(2) and 11 C.F.R. § 104.3(a) and (j). If LG PAC and Mr. Monsees's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

Count II

59.    The FECA and FEC regulations also prohibit knowingly permitting one's name to be used to effect a contribution in the name of another person and knowingly helping or assisting any person in making a contribution in the name of another. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b).

60.    American Policy Coalition and Freedom Frontier each violated this law by allowing their names to be used to effect one or more contributions to super PACs by Unknown Respondents. The close ties between the Greitens campaign, the nonprofits, and the super PACs suggest that the violations were both knowing and willful.

61.    As detailed above, Mr. Greitens' supporters in and out of his campaign devised a scheme to keep the names of donors secret by routing their contributions through conduits.

62.    American Policy Coalition executed part of the planned scheme in July 2016. On July 18, 2016, American Policy Coalition transferred $2 million to SEALs for Truth. On that same day, SEALs for Truth contributed nearly the same amount, $1.975 million, to Greitens for Missouri, concealing the identities of Unknown Respondents who were either the true sources of the money or served as conduits through which the funds passed. Greitens for Missouri appears to have immediately spent the money on media buys supporting the campaign.

63.    Accordingly, American Policy Coalition knowingly permitted its name to be used to effect the contribution and knowingly helped the undisclosed donor make the contribution, in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If these violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

64.     Freedom Frontier similarly executed part of the planned scheme in June and July

2016. Between June 1 and July 29, 2016, Freedom Frontier transferred $4.37 million to LG PAC.

During that same period, LG PAC spent $4.361 million on "media" attacking Mr. Greitens'

opponents in the Missouri Republican gubernatorial primary as well as defending him against

criticism. Routing the money through Freedom Frontier concealed the identities of Unknown

Respondents who were either the true sources of the money or served as conduits through which

the funds passed.

65.     Accordingly, Freedom Frontier knowingly permitted its name to be used to effect

the contribution and knowingly helped the undisclosed donor make the contribution, in violation

of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If these violations were knowing and willful,

they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C.

§§ 30109(a)(5)(C), (d)(1).

66.     Certain Unknown Respondents may have served as conduits for the funds

transferred to American Policy Coalition or Freedom Frontier, further concealing the identities of

other Unknown Respondents who were the true sources of the money. If any Unknown

Respondents knowingly permitted their names to be used to effect the contributions or

knowingly helped other Unknown Respondents make the contributions, they violated 52 U.S.C.

§ 30122 and 11 C.F.R. § 110.4(b). If these violations were knowing and willful, the Unknown

Respondents also are subject to criminal penalties and referral to the Department of Justice. 52

U.S.C. §§ 30109(a)(5)(C), (d)(1).

<u>Count III</u>

67.    The FECA and FEC regulations further prohibit making a contribution in the name of another person. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b).

68.    Unknown Respondents provided funds to American Policy Coalition, which American Policy Coalition transferred to SEALs for Truth. By making one or more contributions to SEALs for Truth in the name of American Policy Coalition, Unknown Respondents violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If Unknown Respondents' violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

69.    Unknown Respondents provided funds to Freedom Frontier, which Freedom Frontier transferred to LG PAC. By making one or more contributions to LG PAC in the name of Freedom Frontier, Unknown Respondents violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If Unknown Respondent's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

<u>Conclusion</u>

WHEREFORE, Citizens for Responsibility and Ethics in Washington and Noah Bookbinder request that the FEC conduct an investigation into these allegations; declare the respondents to have violated the FECA and applicable FEC regulations; and order respondents to correct these violations by filing reports identifying the true source of and any conduits for any transfers to SEALs for Truth improperly attributed to American Policy Coalition as well as the true source of and any conduits for any transfers to LG PAC improperly attributed to Freedom Frontier. In addition, the complainants request that the FEC impose sanctions appropriate to

25

these violations, and take such further action as may be appropriate, including referring this

matter to the Department of Justice for criminal prosecution.



ON BEHALF OF COMPLAINANTS
Noah Bookbinder
Executive Director
Citizens for Responsibility and Ethics
  in Washington
455 Massachusetts Ave. N.W.
Washington, D.C. 20001
(202) 408-5565 (phone)
(202) 588-5020 (fax)

26

Verification

Citizens for Responsibility and Ethics in Washington and Noah Bookbinder hereby verify that the statements made in the attached Complaint are, upon information and belief, true. Sworn pursuant to 18 U.S.C. § 1001.


_____
Noah Bookbinder


Sworn to and subscribed before me this 20 day of November, 2018


_____
Notary Public