EXHIBIT
9

# Dysfunction and Deadlock:

## The Enforcement Crisis at the Federal Election Commission Reveals the Unlikelihood of Draining the Swamp



Office of Commissioner Ann M. Ravel

Federal Election Commission

February 2017

**EXECUTIVE SUMMARY**

The Federal Election Commission ("FEC") is an independent regulatory agency established to enforce and administer federal campaign finance laws.

Over the past ten years—as the results of this new study lay bare—the effectiveness of the FEC has deteriorated. It appears that these trends could accelerate in 2017, so it is important for the public to know about its failures.

While the FEC's employees strive to fulfill its mission, the Commission itself—made up of six Commissioners—is not performing its duty. A bloc of three Commissioners routinely thwarts, obstructs, and delays action on the very campaign finance laws its members were appointed to administer. This bloc voted in lockstep 98% of the time, according to a recent news analysis of cases closed since 2015.[1]

Due to the bloc's ideological opposition to campaign finance law, major violations are swept under the rug and the resulting dark money has left Americans uninformed about the sources of campaign spending.

The Commission's work is essential to the integrity and fairness of the political process and to ensure public trust in government. As the FEC explains on its website, campaign finance law seeks to "limit the disproportionate influence of wealthy individuals and special interest groups in the outcome of federal elections; regulate spending in campaigns for federal office; and deter abuses by mandating public disclosure of campaign finances."[2]

> **Statistics about deadlocked 3-3 votes do not tell the whole story**. For nearly every case of major significance over the past several years, the Commission has deadlocked on investigating serious allegations or has failed to hold violators fully accountable. This report highlights some of the most recent examples of deadlock and dysfunction.

This incredibly significant Commission is not performing the job that Congress intended, and violators of the law are given a free pass. Because of this, candidates and committees are aware that they can ignore the laws enacted to protect the integrity of our elections.

This report exposes, among other things, how the Commission and some of its members have:

> ***Dramatically Increased the Number of Deadlocked Substantive Votes From 2006 - 2016***. The bloc has used the four vote requirement to take most action as unchecked veto power to delay and dismiss flagrant violations, impose significantly lower penalties, and leave major cases without resolution. In 2006, commissioners deadlocked in just 2.9% of substantive votes in Matters Under Review ("MURs"—also known as enforcement cases) closed that year. For MURs closed in 2016, the Commissioners deadlocked on 30% of all substantive votes taken in those matters. In 2006, only 4.2% of MURs closed had at least one deadlocked vote. However, in 2016, 37.5% of all MURs closed had at least one deadlocked vote.

***Dramatically Reduced Fines Over the Past Decade.*** In 2006, the Commission assessed more than $5.5 million in MUR civil monetary penalties. In 2016, MUR civil penalties imposed totaled only $595,425. By comparison, this is significantly less than the nearly $900,000 that California's Fair Political Practices Commission, an agency for one state, assessed in 2016.

***Failed to Enact New Regulations Post-*Citizens United *Concerning Secret Campaign Spending.*** In *Citizens United*, the Supreme Court approved disclosure so that voters can be informed about who is behind political campaigns. Since the Court's decision in 2010, more than $800 million in federal campaign spending has come from undisclosed sources. Yet the bloc has prevented any enactment of rules to ensure that all campaign spending is disclosed.

***Ideologically Opposed the Agency's Purpose.*** Commissioner Goodman told the *New York Times* that "Congress set this place up to gridlock. This agency is functioning as Congress intended. The democracy isn't collapsing around us." White House Counsel Don McGahn, a former Commissioner himself, said during his FEC tenure that he would "plead guilty as charged" to "not enforcing the law as Congress passed it."

***Blocked Investigations of Serious Campaign Finance Violations by Changing the Standard of Proof***. When a complaint is filed and the alleged violator responds, if there are indications that a violation of the law may have occurred, the Commission is supposed to investigate to gather additional facts to determine if there was—or was not—wrongdoing in important cases. The bloc of Commissioners, however, has blocked even a preliminary investigation. Consequently, major violators are routinely let off the hook at this early stage.

This report also highlights 18 illustrative enforcement complaints that have come before the Commission recently in which the agency failed to require meaningful accountability from individuals, corporations, labor unions, and dark money groups. These cases are not an exhaustive list, but show the serious consequences of gridlock, including lack of disclosure and political committee registration, employer coercion, candidates' personal use of campaign funds, and foreign national contributions. Although many of these cases captured public attention, in none did the Commission hold wrongdoers accountable for the full extent of their misconduct.

These matters include:

- EMPLOYEE COERCION: **Robert E. Murray and Murray Energy Corp. [MURs 6661, 6651]** In October 2012, a complaint alleged that Murray Energy and its CEO coerced employees, including by threats of being fired, to pressure them to contribute to Gov. Mitt Romney's presidential campaign. Although the nonpartisan Office of General Counsel ("OGC") recommended that there was reason to believe that this violated the law and that the Commission should authorize an investigation, the three Commissioners in the anti-enforcement bloc voted to do nothing. Similar allegations against the same company in another case were also not investigated.

- PASS-THROUGHS TO KEEP CONTRIBUTORS' IDENTITIES SECRET: **The "LLC Cases" [MURs 6485, 6487, 6488, 6711, 6930]** Five separate complaints alleged that several limited liability companies ("LLCs") contributed to Super PACs supporting a

presidential candidate in order to hide the true identity of the contributor. The complaints alleged that the LLCs were created as a pass-through for millions of dollars in contributions from individuals who wished to keep their identities secret. One contributor openly admitted that he gave to his newly formed LLC for the sole purpose of hiding his identity and evading disclosure. OGC recommended that the Commission find reason to believe the LLCs had violated the law in all but one of the matters. As several cases were pending for four years, three Commissioners made more than 10 motions to open an investigation. The anti-enforcement bloc of Commissioners abstained or voted against OGC's recommendations, preventing disclosure of the source of the money.

- FAILURE OF "SOCIAL WELFARE" ORGANIZATIONS TO REGISTER AS POLITICAL COMMITTEES AND DISCLOSE: Commission on Hope Growth and Opportunity ("CHGO") [MURs 6391 and 6471] A complaint alleged that CHGO, a 501(c)(4) "social welfare" organization, failed to report and include required disclaimers on more than $2 million of advertisements. OGC recommended that the Commission find reason to believe that CHGO violated the law by failing to disclose spending on the ads and omitting the proper disclaimers. OGC also recommend finding reason to believe that CHGO should have registered as a political committee, which would have required it to inform the public about how it raises and spends money to influence elections. The Commission deadlocked on some of OGC's recommendations, but authorized a limited investigation. The investigation found voluminous evidence that CHGO's major purpose was to influence federal elections and that 85% of the money it spent in 2010 — $4.77 million — funded political advertisements. The anti-enforcement bloc of Commissioners refused to find a violation, and refused to enter into settlement negotiations with CHGO. Nothing was done about this clear violation.



Source: Analysis of Vote Certifications in the FEC's Enforcement Query System ("EQS")



Source: Analysis of Vote Certifications in the FEC's Enforcement Query System ("EQS")



Source: Analysis of FEC Enforcement Statistics, Total MUR Civil Penalties,
http://www.fec.gov/press/bkgnd/EnforcementStatistics.shtml.

DYSFUNCTION AND DEADLOCK: ENFORCEMENT CRISIS AT THE FEDERAL ELECTION COMMISSION

EXECUTIVE SUMMARY ............................................................................................................................1

I. BACKGROUND: FEC ENFORCEMENT PRIMER .............................................................................6

    A. *The Enforcement Process* ...........................................................................................................6

    B. *Undermining Enforcement Standards*.........................................................................................7

    C. *The Steep Rise in Deadlocked Enforcement Votes* .....................................................................7

II. CASE STUDIES .................................................................................................................................12

    A. *Coercion* ...................................................................................................................................12

    B. *Disclosure* ................................................................................................................................13

    C. *Political Committee Status*.......................................................................................................16

    D. *Personal Use* ............................................................................................................................19

    E. *Contributions By Foreign Nationals*........................................................................................20

ENDNOTES...........................................................................................................................................21

Prepared by the Office of Commissioner Ann M. Ravel[3]

I. Background: FEC Enforcement Primer

A. *The Enforcement Process*

Congress created the FEC to enforce the Federal Election Campaign Act ("FECA") in the wake of the Watergate scandal of the 1970s. The FEC's main duties under FECA include supervising the public disclosure of money raised and spent in connection with federal campaigns, providing information about FECA, encouraging compliance, and enforcing federal campaign finance laws through audits, investigations, and civil litigation.[4] These laws and duties are in place to prevent corruption and protect the integrity of the political process.

Although some have criticized the agency as the "Failure to Enforce Commission" and a "toothless tiger,"[5] it worked to enforce the law in a bipartisan manner for many years. Congress intended the agency to be structured so that a single political party could not unduly influence the agency or its enforcement outcomes. As such, no more than three of the Commission's six Commissioners can come from a single political party.

What follows is a general description of the Commission's process for enforcing the law in novel, complex, or sophisticated matters. These are classified as "**Matters Under Review**" ("**MUR**"). Matters that are less complicated, depending on the circumstances, may be referred to an **Alternative Dispute Resolution** program or the Commission's **Administrative Fines Program**. The latter calculates pre-established fines when political committees are late in filing their disclosure reports, or fail to file reports entirely.

**The enforcement process is usually triggered when an individual files a complaint or a matter is internally referred within the FEC**. Complaints must be sworn and notarized. Potential violations may also be self-reported, or referred from the agency's Audit Division, its Reports Analysis Division ("RAD"), or another government agency.

In general, the Commission's nonpartisan Office of General Counsel ("OGC") provides a copy of the complaint to each named respondent that is alleged to have violated the law. The respondent can reply to the allegations in writing.

**OGC then reviews the submitted materials and recommends a response to the Commission.** Possible courses of action are to **find reason to believe ("RTB")** that the respondent has committed or is about to commit a violation of the law; to **dismiss the matter** consistent with the agency's prosecutorial discretion to preserve its resources for other cases; or to **find no reason to believe** that a violation has occurred. If the Commission dismisses the matter, or finds no reason to believe that a violation has occurred, the case is usually closed.

If four commissioners agree that there is RTB that a violation has occurred or is about to occur, the Commission may open an investigation, find probable cause that a violation has occurred or is about to occur, open settlement negotiations to resolve the matter, or, after finding probable cause, file a lawsuit in the event no alternative resolution is possible.

**Importantly, at every stage discussed above, the affirmative vote of four commissioners is necessary to move forward.** This provides ample opportunity for commissioners to block action by splitting 3-to-3.

## B. *Undermining Enforcement Standards*

**Finding RTB—the first step toward proceeding with an enforcement matter—is *not* a finding that a violation has occurred, or is about to occur.** As the Commission has itself said, "a 'reason to believe' finding by itself *does not establish that the law has been violated*."[6] It is merely a threshold determination that permits the Commission's staff to investigate further to establish whether there was—or was not—a violation.

Finding RTB means only that a violation *may* have occurred, on the basis of the complaint and the response. It allows the Commission to collect additional facts to make a better determination of whether a violation occurred. The standard of proof to find RTB is low. It is lower than the standard required in civil cases, such as proving something by a "preponderance of the evidence" or "clear and convincing evidence."[7] And it is far lower than the "proof beyond a reasonable doubt" standard in criminal cases.[8]

Unfortunately, as will be shown in cases below, the anti-enforcement bloc has unilaterally imposed higher requirements to find RTB. In doing so, the bloc has shut down the Commission's ability to even investigate serious allegations in sworn complaints. Their standard, which is contrary to the law, has stymied the Commission's ability to even *open* an investigation and uphold the law in major cases.

## C. *The Steep Rise in Deadlocked Enforcement Votes*

The four-vote requirement for the Commission to take action on most matters ensures bipartisan oversight, but also creates multiple opportunities in a single MUR for deadlock and delay that is at cross-purposes with the agency's mission. A deadlock could be a 3-3 vote, or anything other than four affirmative votes.

Deadlocks may prevent the Commission from resolving important matters of campaign finance enforcement. In addition to relieving violators of their obligation to follow the law, they often deprive candidates, campaigns, political parties, and others of certainty about how the law will be enforced.

As the *New York Times* reported, deadlocked votes "have created a rapidly expanding universe of unofficial law, where Republican commissioners have loosened restrictions on candidates and outside groups simply by signaling what standards they are willing to enforce."[9] Last year, a campaign finance attorney whose firm represents candidates and political parties told the *Washington Post* that "we are in an environment in which there has been virtually no enforcement of the campaign finance laws."[10]

Commenters have analyzed different statistics to gauge whether the Commission is deadlocking on an increasing number of matters. Most of them have found that the Commission's rate of

deadlocked votes is increasing. For example, the Congressional Research Service found that in 2014, commissioners deadlocked on 24.4% of closed enforcement matters—nearly double the 13% it found in 2008-2009.[11] Public Citizen, a nonpartisan advocacy organization, found that the Commission deadlocked on 22.5% of its 204 enforcement votes in 2013, up from 0.9% of the 1,036 votes in 2003.[12] NBC News conducted an analysis of cases that have been closed since 2015 to determine how commissioners voted when deciding to authorize an investigation. According to its analysis, "the Republicans did vote as a bloc 98 percent of the time, only breaking rank four times when Commissioner Lee Goodman recused himself. In comparison, the other three commissioners voted as a bloc in 87% of those votes."[13]

To some Commissioners, deadlocks are not an obstacle to achieving the Commission's purpose, but a feature of its structure.

President Trump's White House Counsel Don McGahn, a former Commissioner, said that he was "not enforcing the law as Congress passed it. I plead guilty as charged."[14] Although Mr. McGahn qualified his statement by positing that he intended to enforce the law as it's been upheld by the courts, his record speaks for itself.

Commissioner Goodman told the *New York Times* that "Congress set this place up to gridlock. This agency is functioning as Congress intended. The democracy isn't collapsing around us."[15]

At the same time, members of the anti-enforcement bloc have released their own analyses to show more bipartisan agreement than the trends otherwise suggest. For example, in September 2016, the three Republican Commissioners provided NBC News with their own evaluation of 394 certified votes that the Commission had taken by that time in 2016. They wrote that "86% of all votes taken this year have reflected bipartisan agreement of a majority of Commissioners," and that "78% of Commission votes were *unanimous*."[16]

However, these numbers are deceiving. The Republican Commissioners failed to acknowledge that many of the certified votes that they counted were routine administrative or ministerial matters, not enforcement matters. For example, 20 unanimous votes indicated approval of the minutes from previous meetings of the Commission. They included dozens of votes that deal exclusively with internal personnel issues such as promotions, staff salaries and extensions of temporary appointments. They also included more than 50 noncontroversial matters related to the agency's Administrative Fine Program, which imposes pre-determined fines when political committees are late in filing their reports or fail to file reports entirely. These routine votes are hardly indicative of a well-functioning Commission and falsely inflate their willingness to join in bipartisan compromise on novel, complex, or sophisticated enforcement matters.

The office of Commissioner Ann M. Ravel performed its own analysis of vote certifications in closed MURs, as available on the agency's publicly-available Enforcement Query System ("EQS"). Its findings are shown in the charts below. Each year's data set was comprised of all certified votes in MURs whose files were closed that year. This means, for example, that 2006's data set contained matters that were opened as early as the 1990s but were not closed until 2006. The methodology used to calculate when commissioners deadlocked on at least one vote in a closed MUR is consistent with that of the Congressional Research Service.[17]

Votes were separated into "substantive" and "non-substantive" votes, where votes to close the file and send appropriate letters to the parties regarding the file's closing were "non-substantive,"[18] and all other votes were "substantive." Examples of substantive votes include to find RTB, authorize an investigation, accept a conciliation (i.e., settlement) agreement, take no further action, and to dismiss a case.

The statistics confirm that deadlocks on substantive votes are, in fact, increasing. In MURs closed in 2006, Commissioners deadlocked in just 2.9% of substantive votes. The number of deadlocked substantive votes averaged only 9.6% in MURs closed through 2012, before significantly increasing to 26.2% in MURs closed in 2013. The number has remained high. For MURs closed in 2016, Commissioners deadlocked on more than 30% of substantive votes in those matters.



Source: Analysis of Vote Certifications in the FEC's Enforcement Query System ("EQS")

These deadlocked votes are frequently dispositive, meaning they result in case closure without any meaningful action. In 2006, no matters closed due to a deadlock; by 2016, that number rose to 12.5%.



**Percent of MURs Closed Due to Deadlocks**

Source: Analysis of Vote Certifications in the FEC's Enforcement Query System ("EQS")

Case closure is not the only effect of the Commission's deadlocks, however. The bloc also uses deadlocks (or the threat of deadlock) to dilute enforcement results and avoid holding violators accountable for the full scope of their conduct. In these instances, the Commission still takes substantive action and proceeds to settlement or a limited investigation, but only after deadlocking on OGC's recommendation to investigate the full scope of an alleged violation. More significant violators understand that they will only get a slap on the wrist. In 2006, only 4.2% of MURs closed that year had at least one deadlocked substantive vote. In 2016, however, 37.5% of MURs closed that year had at least one deadlocked substantive vote.

In these cases, statistics do not fully illuminate the Commission's inability to uphold the law as Congress intended. For example, they do not fully account for cases where the Commission takes very limited action because Commissioners who may favor holding a violator fully accountable will have no choice but to agree to finding RTB for a minor infraction, or significantly reduced penalties.



Source: Analysis of Vote Certifications in the FEC's Enforcement Query System ("EQS")

As the number of deadlocks are increasing, the Commission is collecting fewer and fewer fines. In fiscal year 2006, the Commission assessed more than $5.5M in civil penalties in MURs.[19] In fiscal year 2016, the Commission assessed civil penalties totaling only $595,424 for all federal campaigns.[20] By way of comparison, this is significantly less than the nearly $900,000 that California's Fair Political Practices Commission assessed in 2016.[21]



Source: Analysis of FEC Enforcement Statistics, Total MUR Civil Penalties, http://www.fec.gov/press/bkgnd/EnforcementStatistics.shtml.

Statistics also do not account for an unwillingness of three Commissioners to write any regulations that reflect the current state of the law. In the wake of *Citizens United* in 2010, political operatives and others have spent more than $800 million in dark money, including through LLCs and nonprofit "social welfare" organizations that do not disclose donors to the public.[22] This is occurring in spite of the Court's affirmation that disclosure of campaign spending is important to further basic democratic values of transparency and accountability.

II. CASE STUDIES

The case studies below are illustrative of the Commission's increasing deadlocks and their consequences. They are not exhaustive, but provide snapshots of dysfunction.

A. *Coercion*

There are important rules to protect workers' ability to freely participate in the political process. It is illegal for national banks, corporations, and labor organizations to use physical or economic coercion to secure money or anything of value, like membership dues, for a political contribution or expenditure.[23] When these organizations solicit contributions from an employee, they must inform the employee of the political purpose of their contribution and their rights to refuse to contribute without punishment.[24] Additionally, these organizations cannot direct subordinates to organize or carry out a fundraising project to support a particular candidate as part of their work responsibilities or use any means of coercion to compel an employee or member to make a political contribution to a candidate or political committee.[25]

**MUR 6661 (Robert E. Murray, Murray Energy Corp) 2016**

In October 2012, a complaint alleged that Murray Energy Corporation, the Chairman, President, and CEO of the corporation, Robert E. Murray, and Murray Energy Corporation Political Action Committee ("MECPAC") used coercive solicitation practices in violation of federal campaign finance laws.[26] News accounts reported pervasive coercion at Murray Energy Corporation and that there was "constant pressure" placed on employees "that, if you don't contribute, your job's at stake."[27]

In an article cited in the complaint, two anonymous sources were quoted saying that Robert E. Murray solicited the employees separately for his preferred federal candidates by sending letters to their homes and that Murray Energy Corporation tracked employees' responses to these solicitations.[28] Internal memos and personal letters from Robert E. Murray to managerial staff further corroborated the coercive environment at Murray Energy Corporation.[29] "We have been insulted by every salaried employee who does not support our efforts," one memo stated.[30] Another claimed that "if we do not win this election, the coal industry will be eliminated, and so will your job, if you want to remain in this industry. Please respond to this request."[31]

The FEC's Office of General Counsel ("OGC") recommended that the Commission authorize an investigation of Robert E. Murray, Murray Energy, and MECPAC regarding the alleged coercive actions.[32] Despite the compelling evidence, the Commission deadlocked.[33] Vice Chair Walther, and Commissioners Ravel and Weintraub voted to move forward with the case and wrote that "employees should be free to maintain their personal political beliefs and not be compelled to participate or contribute based on their employees' interests."[34] Failing to enforce the

Commission's regulations of political coercion in the workplace, they wrote, meant that "corporations will feel they may ride roughshod over the rights of their employees."[35]

## MUR 6651 (Murray Energy Corp) 2015

In September 2012, a different complaint alleged that Murray Energy Corporation coerced employees by mandating attendance at a rally to support then-presidential candidate Mitt Romney.[36] Mine workers who did not attend faced retaliation and threats of retaliation for not participating.  Employees were told that the event was mandatory, would be without pay, and were made aware that "letters have gone around with lists of employees who did not attend or donate to political events."[37] Moreover, on the day of the rally, Murray Energy shut down the mine entirely, such that workers scheduled for the affected shifts were not be paid.[38]

OGC observed that Murray Energy "did or may well have . . . coerc[ed] employees to attend the rally for the benefit of the Romney Committee."[39] Chair Ravel, and Commissioners Walther and Weintraub voted to authorize an investigation. Two of the Commissioners wrote that "this type of coercion is a real danger to our democracy — it puts citizens' right to express their political beliefs at the mercy of their employers."[40] Three other Commissioners did not vote to authorize an investigation.  The Commission subsequently closed the case and did nothing to address workplace coercion.[41]

## MUR 6344 (United Public Workers) 2012

Based on an April 2010 union meeting, a complaint alleged that United Public Workers, AFSCME Local 646, AFL-CIO, required its employees to participate in union activities to support 2010 Congressional candidate Colleen Hanabusa in their personal time and terminated two employees who refused to fully participate.[42] The union denied the allegations.[43] OGC found that "the union . . . may not coerce its employees to make in-kind contributions of their off-hour time."[44] Despite OGC's recommendation that the Commission open a limited investigation and find reason to believe United Public Workers, AFSCME Local 646, and AFL-CIO coerced its members into donating their off-hour time to influence a federal election,[45] the Commission deadlocked with Chair Hunter, and Commissioners McGahn and Petersen voting against OGC's recommendations concerning workplace coercion.[46] As such, the Commission did nothing.

B. *Disclosure*

The Supreme Court in *Citizens United* emphasized the importance of disclosure so that voters would know who is behind political campaigns and as a means to curb corruption. The Commission has not, however, written any new disclosure rules to account for new avenues of spending that the decision allowed. Since then, more than $800 million from undisclosed sources has influenced federal elections.[47] Generally, FECA requires all political committees to file periodic reports of contributions and expenditures.[48] The reports include the amount of cash the committee has on hand, total amount of receipts, and the identification of donors.[49] The Commission makes the reports publicly available on its website.[50] Disclosing this information lets voters know who is behind certain messages. It helps voters make informed decisions on Election Day.

13

**MURs 6487 & 6488 (F8, LLC, et al), 6485 (W Spann LLC, et al), 6711 (Specialty Investment Group et. al), 6930 (Prakazrel "Pras" Michel) 2016**

In five separate complaints, the Campaign Legal Center and Democracy 21 alleged that several limited liability companies ("LLCs"), that contributed to Restore Our Future PAC, a Super PAC supporting Gov. Mitt Romney's presidential campaign, and Black Men Vote, a Super PAC supporting President Obama's reelection, were established for the sole purpose of illegally contributing in the name of another person.[51] When used solely as conduits for campaign contributions, such LLCs violate the law because they deprive the public of disclosure.

The allegations provided ample reason to believe that a violation occurred. For instance, one "contributor *acknowledged* that he gave through a newly formed LLC solely to hide his identity and evade disclosure."[52] Another LLC contributed $1 million to Restore Our Future PAC shortly after it was incorporated.  The LLC closed its doors five months later.[53] In another one of the matters, a building manager told NBC News that he had never heard of the company using his building as their business address and that his firm had no record of such a tenant in their building.[54]

For most of the allegations in the complaints, OGC recommended that the Commission find reason to believe the LLCs violated the Act and Commission regulations and advised the Commission to open an investigation into these corporations.[55]

Over a period of almost four years, three Commissioners delayed the consideration, abstained, or voted against OGC's recommendations to begin looking into whether the LLCs violated the law. Commissioners Ravel, Walther, and Weintraub made over ten motions to begin an investigation. Every motion failed.[56] As such, the Commission did nothing.

**MUR 6294 (Americans for Job Security) 2015**

In an earlier matter, the Commission deadlocked on finding whether there was a reason to believe Americans for Job Security ("AJS"), a 501(c)(6) organization, failed to properly disclose information related to $4.6 million that the organization spent on electioneering communications.[57]

A year later, another complaint was filed against AJS alleging that the organization violated campaign finance laws by omitting the names and information of certain donors related to a specific electioneering communication in their 24-Hour Report to the Commission.[58]

In reviewing the allegations, OGC noted that in *Citizens United*, the Supreme Court upheld disclosure rules that require corporations to report contribution and expenditure information.[59] According to Commission regulations, those requirements include that entities engaging in electioneering communications disclose the name and address of each person who made at least a $1,000 donation to the corporation.[60]

Despite this, the Commission again failed to reach a decision regarding AJS' failure to disclose contribution information for $9.5 million in federal election activity.[61] As Chair Ravel, and Commissioners Walther and Weintraub explained in voting to open an investigation into AJS's improper reporting, "we continue to believe that the failure to investigate AJS contradicts the applicable law, and impairs the ability of citizens to make informed decisions in our elections."[62]

14

**MUR 6612 and 6696 (Crossroads GPS) 2015**

In a previous matter, the Commission deadlocked on finding reason to believe that Crossroads Grassroots Policy Strategies ("Crossroads GPS"), a 501(c)(4) non-profit organization, violated campaign finance laws by failing to register as a political committee.[63] Given the overall political activity of Crossroads GPS by spending tens of millions of dollars to influence federal elections, Commissioners Ravel, Walther, and Weintraub voted to find reason to believe that Crossroads GPS violated the law by not registering as a political committee and reporting contributions and expenditures.

Two years later, two complaints before the Commission alleged that Crossroads GPS violated campaign finance laws by failing to disclose individual communications (MUR 6612) and an individual contribution (MUR 6696) in 2012.[64]

After two subsequent votes deadlocked, with Commissioners Ravel, Walther, and Weintraub finding reason to believe and authorizing an investigation and Commissioners Goodman, Hunter, and Petersen opposed, the Commission decided to close the file without taking further action.[65]

Citing concerns about the rapid increase of undisclosed dark money in federal elections, Commissioners Ravel and Weintraub cautioned that "the failure to enforce the law against clear violators is accelerating a troubling trend in the political system."[66] Refusing to hold Crossroads GPS accountable to disclosure requirements was, they said, symptomatic of certain Commissioners' "[unwillingness] to adhere to previously adopted Commission policy on determining political committee status."[67] Had the Commission previously found Crossroads GPS to be a political committee, Crossroads GPS would have been required to report the communications and contributions complained of in this matter.[68]

**MUR 6729 (Checks and Balances for Economic Growth) 2014**

In 2010, Citizens for Responsibility and Ethics in Washington ("CREW") filed a complaint against Checks and Balances for Economic Growth ("CBEG"), a 501(c)(4) non-profit "social welfare" organization, for spending nearly $900,000 on political attack ads without reporting any of these expenses to the Commission.[69] Commission regulations—last updated in 2006, almost ten years before this matter—exempt from disclosure certain website communications. If the same political ad appeared on television, however, CBEG would be required to disclose their expenditures to the Commission.[70]

Chair Goodman, and Commissioners Hunter and Petersen found that because the ads were aired online and not placed for a fee on another person's website, CBEG did not have to report these expenses.[71] The same Commissioners also found that the ads—which included photos of President Obama alongside text reading "ABSOLUTE LIES," video footage of presidential candidate Mitt Romney standing in front of applauding mine workers, and a narrator repeating "President Obama and those like Sherrod Brown are job killers" over photos of Senator Sherrod Brown[72]—were "not electioneering communications" for the same reasons.[73] Vice Chair Ravel, and Commissioners Walther and Weintraub disagreed. Because the Commissioners could not agree on whether groups must disclose at least some information to the public about political advertisements made solely online, no action was taken and the Commission closed the matter.[74]

15

C. *Political Committee Status*

Political committee status is closely linked to disclosure and a voter's right to know who is behind a political campaign. FECA generally defines "political committee" as any "committee, club, association, or other group of persons" which accepts contributions or makes expenditures of more than $1,000 in a calendar year.[75] Every political committee must file statements of organization with the Commission, follow certain structural guidelines, and are subject to periodic reporting requirements.[76] The Supreme Court has clarified that only groups whose *major purpose* is the nomination or election of candidates should be considered a political committee.[77] Registration and reporting keeps the political process transparent to the public. Voters and the press can access data on the Commission's website about an organization's political activities and organization's donor and candidate affiliations. This valuable information can be used to make more informed decisions at the polls.

**MUR 6391 and 6471 (Commission on Hope Growth and Opportunity) 2015**

In October 2010, a complaint alleged that the Commission on Hope, Growth, and Opportunity ("CHGO") failed to report and include proper disclaimers on more than $2 million in independent expenditures and electioneering communications.[78] CHGO is a 501(c)(4) "social welfare" organization.[79] In their application for tax-exempt status, CHGO informed the IRS that they had "no" plans to "spend any money attempting to influence the selection, nomination, election, or appointment of any person to any Federal, state, or local public office or to an office in a political organization."[80]

Yet, in 2010, CHGO spent $4.77 million on political advertisements.[81] CHGO later acknowledged their political goals, noting that it sought "[t]o make an impact using express advocacy in targeted Senate races on key issues including financial reform, energy, taxes, pharmaceuticals, health care and other key concerns," and identified certain states as "potential targets."[82]

The complaint alleged that CHGO should have reported the costs associated with producing and disseminating these advertisements and that each advertisement should have contained a proper disclaimer.[83]

OGC recommended finding reason to believe CHGO violated the law by failing to report the independent expenditures and electioneering communications and by using an improper disclaimer.[84] OGC additionally recommended finding reason to believe that CHGO was required to register as a political committee because it had met the threshold spending amount, and its federal election activity was evidence CHGO had as its major purpose the election or nomination of one or more federal candidates.[85]

Despite these findings, the Commission deadlocked on whether there was reason to believe CHGO used improper disclaimers and should have registered as a political committee, but voted unanimously to authorize an investigation into whether CHGO failed to report independent expenditures and electioneering communications.[86] OGC's investigation unearthed even more evidence that CHGO's major purpose was to advocate for the election of particular federal candidates. At least 85% of the money CHGO spent in 2010, or $4.77 million, was spent on

16

advertisements.[87] These ads included sound bites like, "John Salazar says he's an independent voice. But he voted for the Pelosi agenda an astounding 97% of the time," and "Help Scott Tipton make American work again."[88]

A consultant to CHGO described it as "an organization which focuses on running independent expenditure campaigns in key districts to support the election of Republican candidates."[89] Because of this additional information, OGC again recommended that the Commission find reason to believe CHGO violated campaign finance laws by failing to register and report as a political committee, and by failing to include in its advertisements the appropriate disclaimers.[90]

A vote on these recommendations from OGC again failed with Chair Ravel, and Commissioners Walther and Weintraub voting to approve the recommendations and Vice Chair Petersen, and Commissioners Hunter and Goodman opposed. A motion to enter into settlement negotiations for these violations and for CHGO's reporting violation also failed with the same voting results.[91] Despite entering into the investigation stage for the reporting violations and finding ample evidence of other violations, the Commission was unable to muster the votes to do anything.

## MUR 6402 (American Future Fund) 2014

In October 2010, a complaint alleged that the American Future Fund ("AFF"), a 501(c)(4) "social welfare" organization, spent millions of dollars on federal election campaign activity, but failed to organize, register, and report as a political committee.[92] As such, it deprived voters of valuable information about who is behind the spending intended to influence campaigns.

AFF acknowledged that it had spent $21 million in 2010, reported $7.36 million in independent expenditures, and $1.74 million in electioneering communications—41 percent of their total expenditures[93]—but argued that it did not need to register as a political committee because the organization's "major purpose" was not to influence the nomination or election of a federal candidate.[94]

OGC concluded that "the advertisements on which AFF spent an unknown amount in 2010 . . . provide evidence that AFF had as its major purpose the nomination or election of federal candidates."[95] Consequently, OGC recommended the Commission find reason to believe AFF violated campaign finance laws.

The Commission deadlocked on this recommendation and closed the case. Regarding 501(c)(4) organizations' unregulated and undisclosed influence of federal elections, Commissioners Ravel and Weintraub again noted the FEC again failed to investigate complaints concerning some of the biggest spenders in the 2010 cycle.[96] "[T]his pattern of deadlocks," they wrote "has ensured that record amounts of money continue to be spent on our elections while hidden from public view."[97]

## MURs 6538 & 6589 (Americans for Job Security, American Action Network) 2014

In March 2012, CREW filed complaints against Americans for Job Security ("AJS") and the American Action Network ("AAN").[98]  The complaints alleged that AJS, a tax-exempt 501(c)(6) organization, and AAN, a tax-exempt 501(c)(4) organization, had both failed to register as

political committees.[99] As such, they were not required to report their receipts and expenditures — depriving voters of valuable information about who is behind campaign spending.

The allegations provided reason to believe that a violation had occurred. The organizations did not dispute that they had exceeded the $1,000 threshold the Commission uses to define political committee status.[100] AJS spent roughly $4.9 million in independent expenditures in 2010 and AAN spent more than $4 million on the same. Ample evidence likewise demonstrated that each organization's major purpose was the election of federal candidates.[101] Notably, out of a total of roughly $12.4 million in overall spending in 2010, AJS spent roughly $9.5 million—or 76.5%— on federal campaign activity.[102] Similarly, OGC calculated that AAN spent more than $17 million on federal campaign activity between 2009 and 2011, approximately 62.6% of its total spending.[103]

OGC recommended the Commission find reason to believe that AJS and AAN violated FECA by failing to register as political committees and recommended that the Commission approve an investigation into both organizations.

The Commission deadlocked on both matters, however. With Chair Goodman, and Commissioners Hunter and Petersen refusing to open an investigation, the Commission closed both files.[104]

Chair Ravel, and Commissioners Walther and Weintraub highlighted the importance of enforcing the law in cases such as this, stating, "the entire purpose of the political committee status test boils down to a single, compelling policy interest: disclosure. Disclosure of donors and political spending is crucial."[105]

On September 19, 2016, a federal district court held that the bloc of commissioners acted "arbitrar[ily] and caprici[ously]" as well as "contrary to law" by dismissing these actions and that their decision "blinks reality" in "conclud[ing] that many of the ads . . . were not designed to influence the election or defeat of a particular candidate in an ongoing race."[106] The court remanded the case to the Commission to "conform" with the opinion "within 30 days."[107] They did not do so.[108]

## MUR 6396 (Crossroads GPS) 2014

In October 2010, a complaint was filed alleging that Crossroads GPS, a 501(c)(4) "social welfare" organization,[109] failed to register as a political committee.

From June 1, 2010 through December 31, 2011, Crossroads GPS spent $39.1 million on self-described grants to other non-profits, "communications with the public," and costs associated with these communications.[110] Crossroads GPS reported spending $15.4 million of the $39.1 million on independent expenditures, which OGC concluded expressly advocated for the election or defeat of a federal candidate.[111]

Although Crossroads GPS argued that they were not required to register as a political committee because they spent their remaining funds on issue advocacy and other tax-exempt activities, OGC determined that Crossroads GPS spent an additional $5.4 million in 2010 on communications that clearly criticized or opposed an identified federal candidate.[112]

OGC recommended that the Commission find reason to believe that Crossroads GPS failed to register as a political committee. It also requested authorization to conduct an investigation.[113] Doing so, OGC believed, "may furnish evidence of additional spending on federal campaign activity that will enhance the public record."[114]

Still, regardless of OGC's conclusion that Crossroads GPS spent more than half of its $39.1 million budget on campaign-related communications in 2010,[115] Commissioners Goodman, Hunter, and Petersen voted against finding reason to believe that Crossroads GPS failed to register as a political committee because the organization's "major purpose was not the nomination or election of a federal candidate."[116] The deadlocked vote, which occurred three years after the complaint was filed, blocked Commission action against Crossroads GPS.

D. *Personal Use*

A federal candidate may not use their campaign funds for personal use,[117] which is when a candidate uses a contribution or something of value given to their campaign to fulfill obligations or expenses that would "exist irrespective of the candidate's election, campaign, or individual's duties as a holder of Federal office."[118] Violations of the personal use rules can result in criminal penalties in addition to civil penalties.[119]

**MUR 6518 (Newt 2012) 2016**

In 2012, CREW filed a complaint with the Commission alleging four campaign finance violations against former presidential candidate Newt Gingrich.[120] CREW believed, among other things, that Newt Gingrich converted campaign funds for his personal use when his campaign committee, Newt 2012, paid for expenses related to a mailing list belonging to Gingrich Productions, Inc., a for-profit company that promotes books and media by Newt Gingrich and his wife Callista Gingrich.[121] OGC's analysis found that Newt 2012 paid staff, such as personal assistants and schedulers, to assist in Gingrich Productions events.[122] OGC's analysis also found that Newt 2012 promoted Gingrich Productions products and events, like book-signings and Callista Gingrich's books, on the Newt 2012 website and that "the record reflects that Newt 2012 posted far more than a *de minimis* amount of promotional material on its website, www.newt.org" with more than 80 links to Gingrich Productions products and events.[123] The Commission deadlocked on all of OGC's recommendations, including finding reason to believe that Newt Gingrich violated campaign finance laws by promoting on his campaign website materials and events for which he could profit.[124] The Commission closed the file after sending allegations about reporting violations to the agency's Office of Alternative Dispute Resolution.[125]

**MUR 6672 (Bilirakis for Congress) 2013**

In 2012, a complaint alleged that a Member of Congress (and candidate for re-election) used campaign funds to pay membership dues and event registration fees to the Royal Order of Jesters, a division of Shriners International, which is affiliated with the Masonic fraternity.[126] Because the campaign funds were being used for non-political activities in violation of the Commission's regulations, OGC recommended that the Commission find reason to believe that

Rep. Bilirakis violated campaign finance laws by converting his campaign funds for personal use.[127] Commissioners Walther and Weintraub agreed with OGC to find reason to believe that Rep. Bilirakis may have violated the law. Commissioners Hunter, McGahn, and Petersen disagreed. The Commission then closed the case.[128]

E. *Contributions By Foreign Nationals*

Campaign finance laws have long provided extensive protection against foreign spending in American elections. The Act provides that it is unlawful for a foreign national, "directly or indirectly," to make "a contribution or donation of money or other thing of value in connection with a Federal, State, or local election."[129]

**MUR 6678 (Mindgeek USA, Inc.) 2015**

In 2012, a complaint alleged that foreign nationals who operated adult websites contributed funds to oppose a Los Angeles ballot measure—the "Safer Sex in the Adult Film Industry Act."[130] Prior to considering this matter, the Commission had never addressed whether the current statutory language banning contributions by foreign nationals applied to ballot initiatives. Pursuant to the Act, Commission regulations, and judicial decisions, three Commissioners voted to dismiss the allegations by finding that state and local ballot initiatives were not "elections" under the Act. Chair Ravel and Commissioners Weintraub and Walther disagreed. In a statement, Chair Ravel noted that moving forward in that matter would have been "the result that best accords with the expectation of our citizens, who do not want to see money from foreign sources interfering with fundamentally local decisions."[131] The Commission closed the case. Chair Ravel later expressed her concern that the involvement of foreign money in ballot initiative campaigns is a serious problem that threatens the overall integrity of elections. She asked that OGC draft a proposed rulemaking to clarify that the term "election" for the purpose of the ban on foreign national contributions and expenditures included state and local ballot measures.[132] The Commission deadlocked 3-3 on the proposal, and did nothing to address foreign money in ballot initiatives.

ENDNOTES

[1] Tisha Thompson et al., *Deadlock: FEC Commissioners Say They're Failing to Investigate Campaign Violations*, NBC NEWS-4 WASHINGTON (Sept. 19, 2016), *available at* http://www.nbcwashington.com/investigations/Deadlock-FEC-Commissioners-Say-Theyre-Failing-to-Investigate-Campaign-Violations-394014971.html.

[2] Federal Election Commission, *The FEC and the Federal Campaign Finance Law*, http://www.fec.gov/pages/brochures/fecfeca.shtml (last accessed Jan. 13, 2017).

[3] For terrific research assistance, thanks to interns Amanda McFarland, Poy Winichakul, Cara Schuman, Idean Lahaji, Andrew Pepper-Anderson, and Danielle Caputo.

[4] Federal Election Commission, *Guidebook for Complainants and Respondents on the FEC Enforcement Process,* Federal Election Commission at 4 (May 2012), *available at* http://www.fec.gov/em/respondent_guide.pdf.

[5] PROJECT FEC TASK FORCE, NO BARK, NO BITE, NO POINT (2002), *available at* http://www.democracy21.org/uploads/%7BB4BE5C24-65EA-4910-974C-759644EC0901%7D.pdf.

[6] 72 F.R. 12545, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process (March 16, 2007).

[7] *See* Statement of Reasons of Commissioner Steven T. Walther in the Matter of MUR 6396 (Crossroads Grassroots Policy Strategies) at 9, dated Dec. 30, 2014.

[8] *Id.*

[9] Nicholas Confessore, *Election Panel Enacts Policies by Not Acting,*" N.Y. TIMES (Aug. 26, 2014), *available at* http://www.nytimes.com/2014/08/26/us/politics/election-panel-enacts-policies-by-not-acting.html.

[10] Matea Gold, *Trump's Deal With the RNC Shows How Big Money is Flowing Back to the Parties*, WASH. POST (May 18, 2016), *available at* https://www.washingtonpost.com/politics/trumps-deal-with-the-rnc-shows-how-big-money-is-flowing-back-to-the-parties/2016/05/18/4d84e14a-1d11-11e6-b6e0-c53b7ef63b45_story.html.

[11] R. SAM GARRETT, CONG. RESEARCH SERV., R44318, THE FEDERAL ELECTION COMMISSION: ENFORCEMENT PROCESS AND SELECTED ISSUES FOR CONGRESS 12 (2015), *available at* https://www.fas.org/sgp/crs/misc/R44319.pdf.

[12] PUBLIC CITIZEN, ROILED IN PARTISAN DEADLOCK, FEDERAL ELECTION COMMISSION FAILING 1,4, *available at* https://www.citizen.org/documents/fec-deadlock-update-april-2015.pdf.

[13] Tisha Thompson et al., *Deadlock: FEC Commissioners Say They're Failing to Investigate Campaign Violations*, NBC News-4 Washington (Sept. 19, 2016), *available at* http://www.nbcwashington.com/investigations/Deadlock-FEC-Commissioners-Say-Theyre-Failing-to-Investigate-Campaign-Violations-394014971.html.

[14] Michael Beckel, *Federal Election Commissioner Donald McGahn Criticizes 'Overreach' of Campaign Finance Reuglations*, OPENSECRETS BLOG (Mar. 21, 2011), https://www.opensecrets.org/news/2011/03/federal-election-commissioner-donald-mcgahn-criticizes-overreach/.

[15] Eric Lichtblau, *F.E.C. Can't Curb 2016 Election Abuse, Commission Chief Says*, N.Y. TIMES (May 2, 2015), *available at* http://www.nytimes.com/2015/05/03/us/politics/fec-cant-curb-2016-election-abuse-commission-chief-says.html.

[16] Press Statement by Chairman Matthew S. Petersen and Commissioner Caroline Hunter and Lee E. Goodman, http://media.nbcwashington.com/documents/NBC4+Press+Statement+Sept+2016+[Sept+7+2016].pdf (last accessed Jan. 13, 2017).

[17] GARRETT, *supra* note 11, at 12 n.57.

[18] A vote to "close the file" merely indicates that the Commission will not be considering a matter any further. It does not indicate the Commission's view on the underlying issues in the case. For example, a vote to "close the file" might come after the Commission deadlocks 3-3 on whether to open an investigation. Because there is nothing left to decide after such a deadlock, the Commission may vote unanimously to "close the file."

[19] FEC Enforcement Statistics, http://www.fec.gov/press/bkgnd/EnforcementStatistics.shtml (last accessed Jan. 13, 2017).

[20] *Id.*

[21] Taryn Luna, *FPPC Imposes Nearly $900,000 in Fines in 2016*, SACRAMENTO BEE (Dec. 15, 2016), *available at* http://www.sacbee.com/news/politics-government/capitol-alert/article120980893.html.

[22] Center for Responsive Politics, *Outside Spending by Non-Disclosing Groups*, https://www.opensecrets.org/outsidespending/disclosure.php?range=tot (last accessed Dec. 30, 2016).

[23] *See* 52 U.S.C. § 30118(b)(3)(A). *See also* 52 U.S.C. § 30118(a).

[24] 52 U.S.C. § 30118(b)(3)(B-C).

[25] *See* 11 C.F.R. § 114.2(f)(2).

[26] *See* First General Counsel's Report at 1 (Feb. 1, 2016), MUR 6661 (Robert E. Murray, et. al); Alec MacGillis, *Coal Miner's Donor*, THE NEW REPUBLIC (Oct. 4, 2012), https://newrepublic.com/article/108140/coal-miners-donor-mitt-romney-benefactor.

[27] *See* Statement of Reasons of Vice Chairman Steven T. Walther & Commissioners Ann M. Ravel and Ellen L. Weintraub in the Matter of MUR 6661 (Robert E. Murray, et. al.) at 2, dated May 20, 2016.

[28] *Id.* at 2-3.

[29] *Id.* at 3.

[30] *Id*.

[31] *Id*.

[32] *See* First General Counsel's Report at 1 (Feb. 1, 2016), MUR 6661 (Robert E. Murray, et. al).

[33] Certification (Apr. 12, 2016), MUR 6661 (Robert e. Murray, et. al).

[34] *See supra* note 27, at 6.

[35] *See id.* at 7.

[36] *See id.* at 1-2.

[37] *See* Statement of Reasons of Chair Ann M. Ravel & Commissioner Weintraub in the Matter of 6651 (Murray Energy Corp.) at 2, dated July 23, 2015.

[38] *Id.* at 2.

[39] *See* First General Counsel's Report at 18 (Mar. 20, 2014), MUR 6651 (Murray Energy Corp.).

[40] *See supra* note 37, at 1.

[41] Certification (June 16, 2015), MUR 6651 (Murray Energy Corp.).

[42] *See* Statement of Reasons of Vice Chair Ellen L. Weintraub & Commissioners Cynthia L. Bauerly and Steve T. Walther in the Matter of MUR 6344 (United Public Workers, AFSCME Local 646, AFL-CIO) at 1 (dated Aug. 8, 2012).

[43] *See* First General Counsel's Report at 4 (Jan. 31, 2011), MUR 6344 (UPW).

[44] *Id.* at 7.

[45] *Id.* at 17.

[46] *See* Statement of Reasons of Chair Caroline C. Hunter & Commissioners Donald F. McGahn II and Matthew S. Petersen in the Matter of 6344 (United Public Workers, AFSCME Local 646, AFL-CIO) (dated Aug. 8, 2012). The Commission eventually voted 6-0 to find no reason to believe on all of the coercion allegations, but agreed to find reason to believe for another allegation that the union failed to report their independent expenditures properly. Certification (Apr. 5, 2011), MUR 6344 (UPW).

[47] Center for Responsive Politics, *Outside Spending by Disclosure, Excluding Party Committees*, https://www.opensecrets.org/outsidespending/disclosure.php?range=tot (last accessed Nov. 28, 2016).

[48] *See* 52 U.S.C. § 30104(a)(1).

[49] *See* 52 U.S.C. § 30104(b).

[50] *See generally* 52 U.S.C. § 30104

[51] *See, e.g.*, First General Counsel's Report in MUR 6485 (W Spann LLC, et al.), dated Aug. 28, 2012, at 3.

[52] *See* Statement of Reasons of Commissioners Ann M. Ravel & Ellen L. Weintraub in the Matters of MURs 6485 (W Spann LLC, *et al.*), 6487 & 6488 (F8, LLC, *et al.*), 6711 (Specialty Investments, Inc., *et al.*) at 2, dated Apr. 13, 2016).

[53] *See* Complaint at 3 (Aug. 5, 2011), MUR 6485 (W Spann).

[54] *See* Michael Isikoff, *Firm gives $1 million to pro-Romney group, then dissolves,* NBC NEWS (Aug. 4, 2011), *available at* http://today.msnbc.msn.com/id/44011308/ns/politics-decision_2012/, *cited in* Compl. at 2 (Aug. 5, 2011), MUR 6485 (W Spann).

[55] *See* Statement of Reasons of Vice Chair Steven T. Walther, Commissioners Ann M. Ravel & Ellen L. Weintraub in the Matters of MURs 6485 (W Spann LLC, *et al.*), 6487 & 6488 (F8, LLC, *et al.*), 6711 (Specialty Investments, Inc., *et al.*) at 2, dated Apr. 1, 2016).

[56] *See* Certification (Feb. 23, 2016), MURs 6487 & 6488 (F8); Certification (Feb. 23, 2016), MUR 6930 (Michel); Certification (Feb. 23, 2016), MUR 6711 (Specialty Investment Group); Certification (Feb. 23, 2016), MUR 6485 (W Spann); Certification (Nov. 17, 2015), MURs 6487 & 6488 (F8); Certification (Nov. 17, 2015), MUR 6711 (Specialty Investment Group); Certification (Nov. 17, 2015), MUR 6485 (W Spann); Certification (Oct. 29, 2015), MURs 6487 & 6488 (F8); Certification (Oct. 29, 2015), MUR 6711 (Specialty Investment Group); Certification (Oct. 29, 2015), MUR 6485 (W Spann).

[57] *See* Certification in MUR 6538 (Americans for Job Security), dated June 24, 2014; Certification in MUR 6589

22

(American Action Network), dated June 24, 2014. In both matters, we voted to find reason to believe that the groups violated the Act. *Id.* Chairman Goodman and Commissioners Hunter and Petersen dissented. *Id.*

[58] *See* First General Counsel's Report at 1-2 (Feb. 26, 2015), MUR 6294 (Americans for Job Security).

[59] *Id.* at 9.

[60] *Id.* at 9-10.

[61] *See* Certification in MUR 6294 (Americans For Job Security), dated Apr. 21,2015.

[62] *See* Statement of Reasons of Chair Ann M. Ravel & Commissioners Steve T. Walther and Ellen L. Weintraub in the Matter of MUR 6294 (Americans for Job Security), dated Apr. 21, 2015.

[63] *See* Certification (Dec. 3, 2013), MUR 6396 (Crossroads GPS).

[64] *See* Statement of Reasons of Chair Ann M. Ravel & Commissioner Ellen L. Weintraub in the Matter of MURs 6612 & 6696 (Crossroads GPS) at 1, dated Jan. 22, 2016.

[65] Certification (Nov. 17, 2015), MUR 6612 (Crossroads GPS) (producing two deadlocked votes); Certification (Nov. 17, 2015), MUR 6696 (Crossroads GPS) (producing two deadlocked votes); Certification (Dec. 17, 2015), MUR 6612 (Crossroads GPS) (voting to close the file); Certification (Dec. 17, 2015), MUR 6696 (Crossroads GPS) (voting to close the file).

[66] *See supra* note 64, at 2.

[67] *Id.*

[68] *Id.*

[69] *See* First General Counsel's Report at 2, 4 (Aug. 6, 2014), MUR 6729 (Checks and Balances for Economic Growth).

[70] *See* Statement of Reasons of Commissioner Ann M. Ravel in the Matter of MUR 6729 (Checks and Balances for Economic Growth) at 1, dated Oct. 24, 2016.

[71] *See* Statement of Reasons of Chairman Lee E. Goodman & Commissioners Caroline C. Hunter and Matthew S. Petersen in the Matter of MUR 6729 (Checks and Balances for Economic Growth) at 2, dated Oct. 24, 2014.

[72] *See supra* note 69, 2-3.

[73] *See supra* note 71, at 4.

[74] *See* Certification in MUR 6729 (Checks and Balances), dated Sept. 16, 2014.

[75] 52 U.S.C. § 30101(4)(A).

[76] *See* 52 U.S.C. §§ 30103, 30104.

[77] *See Buckley v. Valeo*, 424 U.S. 1, 79-80 (1976).

[78] *See* First General Counsel's Report at 3 (Dec. 26, 2013), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[79] *Id.* at 5.

[80] *See* Statement of Reasons of Vice Chairman Steven T. Walther in the Matter of MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity) at 5 n.14.

[81] *See* Statement of Reasons of Chair Ann M. Ravel & Commissioner Ellen L. Weintraub in the Matter of MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity) at 1, dated Nov. 5, 2015.

[82] *See supra* note 80, at 5 n.14.

[83] *See* Complaint at 4-5 (Oct. 4, 2010), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[84] *See* First General Counsel's Report at 39 (Dec. 26, 2013), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[85] *Id.* at 38-39.

[86] *See* Certification (Dec. 16, 2014), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[87] *See supra* note 81, at 1.

[88] *See id.* at 2-3.

[89] *See id.* at 2.

[90] *See* Third General Counsel's Report at 39 (Sept. 24, 2015), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[91] Certification (Oct. 1, 2015), MURs 6391 & 6471 (Commission on Hope, Growth, and Opportunity).

[92] *See* First General Counsel's Report at 3 (Jan. 17, 2013), MUR 6402 (American Future Fund).

[93] *See* Statement of Reasons of Vice Chair Ann M. Ravel & Commissioner Ellen L. Weintraub in the Matter of MUR 6402 (American Future Fund) at 2, dated Dec. 18, 2014.

[94] *See supra* note 92, at 5.

[95] *Id.* at 17.

[96] *See supra* note 93, at 3.

[97] *Id.*

[98] *See* Complaint at 1 ¶ 1 (Mar. 8, 2012), MUR 6538 (Americans for Job Security); Complaint at 2 ¶ 7 (June 7, 2012), MUR 6589 (American Action Network).

[99] *See* Complaint at 3 ¶ 7-8 (Mar. 8, 2012), MUR 6538 (Americans for Job Security).

[100] *Id*. at 11 ¶ 36.

[101] *Id*. at 11 ¶ 37

[102] *See* First General Counsel's Report at 22 (May 2, 2013), MUR 6538 (Americans for Job Security).

[103] *Id*. at 25.

[104] Certification (June 24, 2014), MUR 6538 (Americans for Job Security) & 6589 (American Action Network).

[105] *See* Statement of Reasons of Vice Chair Ann M. Ravel & Commissioners Steven T. Walther and Ellen L. Weintraub in the Matters of MURs 6538 & 6589 (Americans for Job Security and American Action Network), at 5, dated July 30, 2014.

[106] Citizens for Responsibility and Ethics in Washington v. Federal Election Commission, No. 1:14-cv-01419 (CRC), 2016 WL 5107018 , at *11 (D.D.C. Sept. 19, 2016).

[107] *Id.* at *12.

[108] *See* Statement of Reasons of Commissioners Ann M. Ravel and Ellen L. Weintraub in the Matter of MUR 6589R (American Action Network), dated Dec. 5, 2016.

[109] *See* Complaint ¶ 24 (Oct. 12, 2010), MUR 6396 (Crossroads GPS).

[110] *See* First General Counsel's Report at 6 (Nov. 21, 2012), MUR 6396 (Crossroads GPS).

[111] *Id*. at 7.

[112] *Id*. at 7, 17.

[113] *Id*. at 27.

[114] *Id*.

[115] *Id*. at 26-27; Statement of Reasons of Vice Chair Ann M. Ravel & Commissioners Steven T. Walther and Ellen L. Weintraub in the Matter of MUR 6396 (Crossroads GPS) at 4, dated Jan. 10, 2014.

[116] *See* Statement of Reasons of Chairman Lee E. Goodman & Commissioners Caroline C. Hunter and Matthew S. Petersen in the Matter of MUR 6396 (Crossroads GPS) at 1, dated Jan. 8, 2014.

[117] 52 U.S.C. § 30114(b); 11 C.F.R. § 113.1(g).

[118] 52 U.S.C. § 30114(b)(2); 11 C.F.R. § 113.1(g).

[119] 52 U.S.C. § 30109(d).

[120] *See* First General Counsel's Report at 1-2 (Jan. 29, 2013), MUR 6518 (Newt 2012).

[121] *Id*. at 1-2.

[122] *Id*. at 13-14.

[123] *Id*. at 14-15.

[124] *See* Certification (June 16, 2015), MUR 6518 (Newt 2012).

[125] *See* Certification (Mar. 2, 2016), MUR 6518 (Newt 2012).

[126] *See* First General Counsel's Report at 1-2 (Feb. 13, 2013), MUR 6672 (Bilirakis for Congress).

[127] *Id*. at 5-6.

[128] *See* Certification (Apr. 23, 2013), MUR 6672 (Bilirakis for Congress).

[129] 52 U.S.C. § 30121(a).

[130] First General Counsel's Report in MUR 6678 (Mindgeek USA, Inc.) at 2, dated Sept. 15, 2014.

[131] *See* Statement of Reasons of Chair Ann M. Ravel in the Matter of MUR 6678 (Mindgeek USA, Inc.) at 3, dated Apr. 22, 2015.

[132] Minutes of an Open Meeting of the Federal Election Commission, Thursday Oct. 1, 2015 (approved Oct. 29, 2015 as Agenda Document No. 15-56-A).